Juanita KIRKLAND, et al., Appellees,

v.

DISTRICT OF COLUMBIA, A Municipal Corporation, Appellant.

No. 94–5281.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1995.

Decided Dec. 5, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied Feb. 7, 1996.

---

James C. McKay, Jr., Assistant Corporation Counsel, with whom Charles F. Ruff, Corporation Counsel, Garland Pinkston, Jr., Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the briefs, argued the cause, for appellant.

Dennis M. Hart, with whom Kenneth M. Robinson was on the brief, argued the cause, for appellees. Eric H. Holder, Jr., United States Attorney, R. Craig Lawrence, John D. Bates, Thomas S. Rees, and Bernadette C. Sargeant, Assistant United States Attorneys, entered appearances for appellee United States of America.

Before: BUCKLEY, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Because of the rising crime rate in the District of Columbia, the United States and the District in August 1989 formed a Joint Fugitive Apprehension Team of FBI agents and Metropolitan Police Department ("MPD") officers, charged with the task of arresting the most dangerous wanted people in the District. Two team members, Agent Dennis Rasmussen and MPD Officer Joseph O'Donnell, were assigned to arrest Orlando Stinson, who was wanted on six warrants, one for homicide. Their inquiries into Stinson's whereabouts led them into contact with Stinson's mother, Juanita Kirkland, and his girlfriend and her mother, Monice and Georgia Brown. Out of those encounters arose claims against the United States and the District of Columbia made by Kirkland and Georgia Brown (for herself and as next friend of Monice) for intentional infliction of emotional distress. Ultimately the team tracked Stinson down to an address on N Street, S.E. When he fled, team members shot him, fatally, asserting a belief, shown to have been mistaken, that he was armed and a threat to their lives. From this arose a claim against defendants by Kirkland, as personal representative of the Stinson estate, for negligence in causing the death.

The claims against the United States were tried to the district court, which entered judgment in favor of the United States on all counts, finding that the Browns and Kirkland were not credible witnesses, and that the FBI agents acted reasonably in firing on Stinson. Plaintiffs have not appealed. The claims against the District of Columbia were tried to a jury, which awarded $200,000 to Juanita Kirkland personally, $30,000 to Georgia Brown (but nothing to Monice Brown), and $2,500 to Kirkland as personal representative.

On appeal by defendants, we reverse the judgments in favor of Kirkland and Georgia Brown for intentional infliction of emotional distress; plaintiffs failed to provide adequate notice to D.C. under D.C.Code § 12–309. We affirm the judgment in favor of Kirkland as personal representative, finding no error in the court's denial of judgment as a matter of law.

I.  *Claims for Intentional Infliction of Emotional Distress: Defective Notice*

Two members of the joint team, Agent Dennis Rasmussen and Officer Joseph O'Donnell, twice visited Juanita Kirkland at work at Howard University Hospital in March 1990 in their efforts to locate her son. Their first visit was unsuccessful. Before their second visit, O'Donnell ran a computer check on Kirkland, which revealed that a Juanita Kirkland of approximately the same description was wanted on two warrants for felony uttering of bouncing checks. Rasmussen and O'Donnell visited Kirkland again at her workplace on March 14, 1990. They asked her where her son was, and she said she didn't know. They then arrested Kirkland on the warrants, but it turned out that they were for a different person with the same name. Kirkland later alleged that during this incident the two threatened to kill

her son, thereby inflicting emotional distress.[1]

The two team members also tried to discover Stinson's whereabouts by visiting 802 Bellevue Street, where his girlfriend Monice Brown lived with her mother Georgia. Testimony conflicts as to the number of times the team members visited, with the Browns claiming eight to ten times, and the team members saying they visited twice. The Browns allege the team members engaged in intimidating and insulting conduct toward them, including putting a gun to the head of Georgia Brown's young son, inflicting emotional distress. The team members' testimony sharply contradicts this account, as well as Kirkland's version of the threats against her son allegedly expressed to her.

To maintain a tort action for damages against the District of Columbia, a plaintiff must, within six months of the injury, give "notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage." D.C.Code § 12–309.

On August 21, 1990, Bernard Grimm, a lawyer acting on behalf of Kirkland and the Browns, sent the following letter to the Mayor of D.C.:

> This letter is to notify you under Title 12 § 309 of the D.C.Code that my clients, Juanita Kirkland, Monique [sic] Brown and Georgia Brown, intend to sue the United States Federal Government, the District of Columbia Government, the Metropolitan Police Department and several unknown and unnamed officers for the wrongful death by them of my clients' husband [sic], son and father [sic], Orlando Stinson. The shooting occurred on or about July 13, 1990, at approximately 6:30 a.m. at 2506 N Street, S.E., Washington, D.C. Mr. Stinson was shot and killed without provocation or without probable cause for his arrest.
>
> In a separate and independent law suit I am hereby placing you on notice that Ms. Juanita Kirkland is also filing a Complaint against the District of Columbia government and Metropolitan Police Department

and the Federal Bureau of Investigation for false imprisonment, false arrest, and malicious prosecution stemming from her arrest on March 14, 1990.

■ Plaintiffs wisely make no serious attempt to claim that this constituted adequate notice of the claims now under appeal. Omitting the place of an alleged injury is fatal under § 12–309. *Worthy v. District of Columbia,* 601 A.2d 581, 582 (D.C.1991); *Winters v. District of Columbia,* 595 A.2d 960, 961 (D.C.1991). This alone would seem to doom both claims: the notice makes no reference to the locale either of Kirkland's injury from threats to her son (Howard University Hospital), or of the Browns' injury (802 Bellevue Street). Rather, it mentions only 2506 N Street, the site of Stinson's death.

■ Failure to state the cause and circumstances of the injury is independently fatal. *Winters,* 595 A.2d at 961; *Pitts v. District of Columbia,* 391 A.2d 803, 809 (D.C. 1978). Under the "cause" element, "the written notice ... must disclose both the factual cause of the injury and a reasonable basis for anticipating legal action as a consequence." *Washington v. District of Columbia,* 429 A.2d 1362, 1366 (D.C.1981) (en banc). Under the "circumstances" element, "the circumstances must be detailed enough for the District to conduct a prompt, properly focused investigation of the claim." *Id.* (quotations omitted). Far from mentioning threats on the life of Orlando Stinson, the letter speaks of Kirkland's claim of "false imprisonment, false arrest, and malicious prosecution" and the actual shooting of Stinson—an event separate from the asserted threats.

Quite sensibly, therefore, plaintiffs concentrate instead on a contention that the District waived the notice defense. The District raised the issue in its answer but then failed to include it in its pre-trial statement. As a result the issue was omitted from the pretrial order entered under Fed.R.Civ.P. 16(e). On the morning of trial, but before trial had begun, the District filed a motion raising the defense as to the Browns' claim, but the district court rejected it as untimely. The

---

1. Kirkland also filed an action for false arrest and imprisonment (plus a claim of intentional infliction of emotional distress), which she and the District later settled.

issue, nonetheless, was fully aired at trial. The letter was marked for identification during the District's cross-examination of plaintiffs' witness (their former attorney and author of the letter), the District thoroughly cross-examined the witness as to the adequacy of the letter as notice under § 12–309, and the letter was admitted into evidence. All this occurred without objection by plaintiffs' lawyer. In a motion for judgment as a matter of law the District again argued that plaintiffs had failed to satisfy the requirements of § 12–309, which the district court denied with a brief reference to its prior ruling rejecting the defense as untimely.

Rule 16 makes no express provision for an issue omitted from the pre-trial order but actually tried. Rule 15(b), however, expressly addresses the parallel problem of an issue omitted from the answer but tried: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

We therefore treat the plaintiffs' waiver theory in two stages. First, we consider it *as if* the issue had been omitted from the pleadings but nonetheless litigated in the trial, disregarding the pre-trial statement. This part concludes that, had that been the problem, it would have been an abuse of discretion for the judge to treat the issue as waived. Second, we consider whether a different result should ensue because the omission was from the pre-trial statement, not the answer.

### A. Trial by Implied Consent of an Issue Omitted from the Pleadings

■ Wright and Miller state the rule that a finding of trial by implied consent under Rule 15(b) "seems to depend on whether the parties recognized that an issue not presented by the pleadings entered the case at trial." Charles A. Wright et al., *Federal Practice and Procedure* § 1493, at 19 (1990) [hereinafter Wright & Miller]. This does not require that the parties realize that the issue was not in the pleadings, just that it was presented at trial. See, e.g., *Laffey v. Northwest Airlines*, 567 F.2d 429, 478 n. 370 (D.C.Cir.1976) (Under Rule 15(b),

"the essential inquiry is the understanding of the parties as to whether the unpleaded issue was being contested."); *Kuhn v. Civil Aeronautics Board*, 183 F.2d 839, 842 (D.C.Cir. 1950) (It must be "clear that the parties understand exactly what the issues are when the proceedings are had.... Actuality of notice there must be, but the actuality, not the technicality, must govern.").

■ Trial of the issue without objection normally is enough to satisfy the Rule 15(b) requirement. "[C]onsent generally is found when evidence is introduced without objection, or when the party opposing the motion to amend actually produced evidence bearing on the new issue." Wright & Miller, § 1493, at 24–28. Numerous cases from other circuits hold that consent is found in either of these circumstances. See, e.g., *In the Matter of Prescott*, 805 F.2d 719, 725 (7th Cir. 1986) (finding that issue was tried by implied consent where evidence was introduced without objection); *Norris v. Bovina Feeders, Inc.*, 492 F.2d 502, 506 (5th Cir.1974) (same); *Fejta v. GAF Companies*, 800 F.2d 1395, 1396 (5th Cir.1986) (finding that issue was tried by implied consent where evidence was introduced without objection and opposing party itself introduced evidence on the issue); *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1522 (9th Cir.1985) (same).

Cases in this circuit are few. The one most directly on point is *Rosden v. Leuthold*, 274 F.2d 747, 750 (D.C.Cir.1960), where the court held that an issue (the proper amount of plaintiff's indebtedness alleged on a counterclaim) was tried by implied consent where a party did not object to introduction of evidence at trial. This circuit has followed others in emphasizing that the district court's finding is reviewed for abuse of discretion, and that that discretion is broad since the trial judge "is in a far better position than we to determine the understanding under which the parties proceeded." *Laffey*, 567 F.2d at 478 n. 370 (citing, inter alia, *Macris v. Sociedad Maritima San Nicolas*, 245 F.2d 708, 711 (2d Cir.1957); *Saalfrank v. O'Daniel*, 533 F.2d 325, 330 (6th Cir.1976)).

Here, even under the standard of abuse of discretion, we have no doubt that the parties

fully understood that statutory notice was being contested in the examination of plaintiffs' former attorney on that subject; indeed, plaintiffs' brief suggests no alternative interpretation of the colloquy. The situation is quite different from that in *Dellums v. Powell,* 566 F.2d 167, 177 n. 13 (D.C.Cir. 1977), where we found no implicit consent. There the defense of collateral estoppel was never mentioned in defendants' answers, and no evidence was introduced of the record in the criminal trial that allegedly might have been the source of issue preclusion. Accordingly, we would find trial of the issue by implied consent under Rule 15(b), if omission from the pleading were the problem.

### B. Application of These Principles to the Pre-trial Order

■ Plaintiffs argue that pre-trial orders supersede pleadings, including the answer in this case. This is doubtless true, but the issue for us is what may supersede the pre-trial order. Plaintiffs quote two cases from other circuits stating that the liberal standards for *express* amendments under Rule 15(a) cannot trump the "good cause" requirement for express amendment of a scheduling order under Rule 16(b). See *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609–11 (9th Cir.1992); *Riofrio Anda v. Ralston Purina,* 959 F.2d 1149, 1154–55 (1st Cir.1992). Both concerned explicit attempts to amend a complaint under 15(a) well after the time for amending set by the scheduling order under Rule 16 had passed.

In contrast, this situation is not explicitly governed by *anything* in Rule 16, which does not address the issue of amendment by implicit consent through the receipt of evidence in the course of the trial. *Johnson* and *Riofrio Anda* are also distinguishable in that they involve Rule 16(b)'s explicit limit on amendment of a scheduling order under that rule, while what is involved here is a Rule 16(e) pre-trial order. Rule 16(e) explicitly provides that a pre-trial order "shall control the subsequent course of the action," which

presumably means that the pre-trial order would supersede the pleadings (as plaintiffs themselves note). Accordingly, any case where it is necessary to amend the pleadings by implied consent under Rule 15(b) to accord with the evidence will presumably also be a case where the issue has been tried in contradiction to the pre-trial order; if the new matter had been included in the pre-trial order, that would control by the force of Rule 16(e). Thus, if Rule 16(b)'s "good cause" standard controlled amendment of the pre-trial order to accommodate trial by implied consent, Rule 15(b)'s provision for amendment by implicit consent would be a dead letter.

In *Rosden v. Leuthold, supra,* amendments of both the pleading and the pre-trial statement were necessary to conform to the evidence received at trial, and this court treated both amendments as governed by the implied consent standard of Rule 15(b), observing the "harmony" between the rules and their joint purpose "to avoid the tyranny of formalism." 274 F.2d at 750. Rule 16 had not yet flowered into the elaborate maze it is today (with Rule 16(b)'s scheduling order and "good cause" standard for its amendment), but it did then provide for a pre-trial order, and provided for its explicit amendment in terms almost identical to those of today's Rule 16(e): The order, it said, "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." [2] Cf. *Blackwell v. Regal Cab Co.,* 316 F.2d 398 (D.C.Cir.1963) (applying Rule 15(b) standards for amendment when there is objection at trial to amendment of a Rule 16 pre-trial order); *Manbeck v. Ostrowski,* 384 F.2d 970 (D.C.Cir.1967) (reversing failure to allow explicit amendment under Rule 16— still with the wording quoted above—where introduction of a new issue created neither surprise nor prejudice for adversary and "key factual elements" would largely overlap with those of issue already in the case). We therefore think it correct to use the standards of Rule 15(b) to analyze trial of an issue by implied consent, whether the issue

---

**2.** The relevant part of the rule now states:
This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.
Fed.R.Civ.P. 16(e).

has been omitted from a pleading or from the pre-trial order. Accordingly, we reverse.

## II. *Officers' Reasonableness in Firing on Orlando Stinson*

■ The District argues that it was entitled to judgment as a matter of law on the claim of negligence in the death of Orlando Stinson, saying that the evidence shows that the officers acted reasonably under the circumstances. We review the district court's denial of the motion *de novo*, asking whether the evidence was sufficient for a reasonable jury to have reached the verdict, *Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C.Cir.1995); *Mackey v. United States*, 8 F.3d 826, 829 (D.C.Cir.1993), and viewing the evidence in the light most favorable to the prevailing party, *Bennett Enterprises v. Domino's Pizza*, 45 F.3d 493, 497 (D.C.Cir. 1995). According to District law, a law enforcement officer (like other citizens) is entitled to use deadly force when the officer reasonably believes that he or she, or another, is in imminent danger of death or serious bodily harm. *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C.1993).

■ The facts are simple, if in dispute on a key point. On July 13, 1990 at 2:30 AM, Agent Rasmussen learned from an informant that Stinson was staying at 2506 N Street S.E. and that he had an Uzi with him. Rasmussen waited until the joint team's normal 6:00 AM shift began and then led a team of four FBI agents and four MPD officers to the N Street address. The owner admitted five team members, and the three others took up positions covering the rear of the house. The team gathered the occupants of the house in the living room, except for Monice Brown and Stinson, who were sleeping in the back bedroom. O'Donnell yelled for Stinson to come out. Monice Brown left the room and Agent Rasmussen pulled her out of the line of fire. Stinson then emerged with a blanket wrapped around him. The team members told him to drop the blanket, but

instead, Agent Rasmussen testified, he started to "raise his right arm up under the blanket." At that point the team members fired five shots, all of which missed. The officers testified that they fired because they believed their lives were in danger. Stinson threw off the blanket and ran out the door.

The team members in the back heard the shots. When Stinson ran out the back door, a team member covering the rear yelled "stop, police, stop, stop." According to team members, Stinson turned quickly to his left, at which point they all saw a dark object in his hand, which one officer said was about a foot long and "could have resembled an Uzi." [3] He then turned quickly to the right, and all three team members fired. Stinson staggered forward several feet, collapsed, and died. No weapon was found near him. A dark tennis shoe was found on the ground several feet behind Stinson's body. An Uzi and another 9 mm semi-automatic were later recovered from the back bedroom.

We think a jury could reasonably have found that the officers did not act reasonably. Granted, it appears undisputed that the joint team members had made over 700 arrests without firing a shot, a fact that must have colored the outside officers' interpretation of the volley of shots they heard from inside, supporting an inference that Stinson posed a serious threat, almost certainly with a firearm. Granted further, that the officers had reason to believe Stinson was dangerous, as he was wanted on six felonies, one for homicide, and the informant warned on the morning of the shooting that Stinson had an Uzi with him. Finally, it appears undisputed that Stinson ignored commands to surrender, and headed in the officers' direction, all more or less instantaneously.

But if Stinson's hands were both empty, a jury could find that the officers could not reasonably have believed Stinson posed a threat to their lives. And they could reasonably have concluded that he was empty handed. Agent Rasmussen was questioned as to

---

**3.** An Uzi pistol has a 4.5–inch barrel, a pistol grip (as the name suggests), and no rear stock, and appears to be no more than triple the length of its barrel, Ned Schwing & Herbert Houze, *Standard Catalog of Firearms* 760 (5th ed. 1995),

so it isn't far-fetched for the officers to have thought the object was an Uzi. The fact that the object lacked a magazine might not have been noticed in the heat of the moment.

whether he had seen a shoe in Stinson's hands as he was on his way out; he answered that in the "fleeting moment" available he had not. The district court, to be sure, in exonerating the outside FBI agent in the bench trial, believed the three outside officers' testimony about the dark object, and noted that Rasmussen's contrary observation could have been mistaken, since "things were happening in a flash." But the jury could reasonably have believed the statement, and accordingly discounted the officers' testimony about the dark object—regarding it as either a fabrication or the delusion of over-eager policemen. Accordingly, there was no error in the court's denial of judgment as a matter of law on this claim.

\* \* \*

The judgments in favor of Kirkland personally and Brown are reversed, and the judgment in favor of Kirkland as personal representative is affirmed.

*So ordered.*