Sunday DASKALEA, Appellee,

v.

DISTRICT OF COLUMBIA and Margaret A. Moore, Director, D.C. Department of Corrections, Appellants.

No. 98–7207.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1999.

Decided Aug. 8, 2000.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, Office of Corporation Counsel, argued the cause for appellants. With him on the briefs were Jo Anne Robinson, Interim Corporation Counsel at the time appellants' main brief was filed, Robert R. Rigsby, Interim Corporation Counsel at the time appellants' reply brief was filed, and Charles L. Reischel, Deputy Corporation Counsel. Donna M. Murasky, Assistant Corporation Counsel, entered an appearance.

Gregory L. Lattimer argued the cause and filed the brief for appellee.

Before: SENTELLE, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Uncontradicted evidence at the trial of this case established the routine sexual abuse of women inmates by prison guards at the District of Columbia Jail. The plaintiff, Sunday Daskalea, suffered from a continuing course of such abuse, culminat-

ing in an evening during which "correctional" officers forced her to dance naked on a table before more than a hundred chanting, jeering guards and inmates. The District asks us to relieve it of all responsibility for this conduct, contending that the facts fail to establish the "deliberate indifference" necessary to sustain a municipality's liability for the acts of its employees. But "deliberate indifference" is precisely how any reasonable person would describe the District's attitude toward its women prisoners, and we therefore uphold in full the jury's award of $350,000 in compensatory damages. We are unable, however, to uphold the jury's punitive damages award because District of Columbia law bars the imposition of such awards against the District. And because Daskalea sued codefendant Margaret Moore solely in her official capacity as Director of the Department of Corrections, plaintiff must look to the District alone for payment of compensation.

**I**

This is not the first time the federal courts have reviewed charges of sexual abuse by D.C. correctional officers against female inmates. In 1993, a class action was filed on behalf of all women prisoners under the care of the District of Columbia correctional system. *See Women Prisoners v. District of Columbia,* 877 F.Supp. 634 (D.D.C.1994). In that case, the district court found a pattern of rape and sexual assault—coupled with other forms of sexual harassment, inadequate or nonexistent staff training, and retaliation against women who filed complaints—that rose to a level of objective cruelty sufficient to violate the Eighth Amendment. *See Women Prisoners,* 877 F.Supp. at 639–43, 664–67; *see also Women Prisoners v. District of Columbia,* 93 F.3d 910, 929, 931 (D.C.Cir.1996). The court further found

that the inmates had filed complaints and written letters to prison administrators to no avail, and that the harassment was obvious and widely known. It concluded that the District of Columbia had acted "with 'deliberate indifference' to the condition of sexual harassment which women prisoners at the [District's facilities] must endure," and that the District was therefore liable under 42 U.S.C. § 1983 for the violation of the inmates' constitutional rights. *See Women Prisoners,* 877 F.Supp. at 665–67.[1]

On the basis of the foregoing, the *Women Prisoners* court issued a detailed order on December 13, 1994, requiring the Department of Corrections to "take all action necessary to remedy and prevent" sexual harassment of female inmates by its employees. The court specifically directed the Department to issue, distribute, and post a sexual harassment policy within sixty days, and to conduct mandatory training on sexual harassment for both employees and female inmates. *See Women Prisoners,* 877 F.Supp. at 679–81.

On May 15, 1995, the Department of Corrections issued a policy in response to the *Women Prisoners* order. The policy forbade sexual misconduct and harassment, as well as retaliation for the filing of complaints regarding such behavior, and directed the institution of mandatory training. Although some of the guards who testified at Daskalea's trial remembered receiving the policy, others did not. No inmate testified to receiving the policy, and officers admitted that the policy was never posted. There was no evidence that the training requirements were implemented nor that any significant corrective intervention occurred.

Against this background, we now turn to a consideration of the specific facts of Daskalea's case.

---

1. The District did not appeal the district court's finding of liability. *See Women Prisoners,* 93 F.3d at 928. Although it did appeal aspects of the court's remedial order, the District did not challenge the requirement, dis-

cussed below, that it promulgate a sexual harassment policy. This court ultimately overturned portions of the remedy not relevant here and remanded for further proceedings. *See id.* at 931–32.

## A

■ Daskalea was arrested on drug charges and sent to the D.C. Jail on October 26, 1994—two months before the district court issued its decision and order in the *Women Prisoners* litigation. She was initially housed in South 1, the unit used primarily for women awaiting trial and for those in either solitary confinement or protective custody. From the beginning of her confinement, Daskalea testified that she was called "whore," "white bitch," "cracker," and other epithets by guards and inmates alike.[2]

In January 1995, Daskalea was moved to Southeast 1. This unit housed approximately eighty women who were serving short-term sentences. Upon arrival, she was met with rumors that she was an undercover FBI agent. She was threatened by other inmates, including one who—in the presence of several guards who did not intervene—told her: "Bitch, you better sleep with one eye open." Daskalea's fears of attack were realized when she was subsequently assaulted by two inmates.

The civilian employee in charge of the Jail's library, Edward Gardner, was well known for providing inmates with cigarettes in exchange for sex. It was also widely known that the rooms adjacent to the library were routinely used for sex between library staff and inmates. When Daskalea first attempted to use the library's research materials, Gardner leered at her and rubbed his genitals. She rebuffed his advances, and thereafter had difficulty obtaining any assistance from the library staff. Some time later, a guard took Daskalea out of her cell and brought her to the library. The guard led her to a room where a male inmate, notorious for engaging in sexual misconduct in the li-

brary, was waiting. The inmate then attacked her, attempting a sexual assault.

As time went on, the campaign of fear, harassment, and violence against Daskalea—on the part of both staff and inmates—intensified. Guards told her they would break her. One day, when inmates were supposed to be on lockdown, a prisoner known as Bootsie came to Daskalea's cell and spat and cursed at her. Later that day a guard, Sgt. Theresa Noble, forcibly restrained Daskalea's hands while Bootsie attacked her. Plaintiff stopped sleeping at night for fear she would be raped or assaulted.

The testimony at trial disclosed a culture of routine acceptance of sexual encounters between staff and inmates on Southeast 1. One cell, known as Cell 73, was kept empty and used for sex between prisoners and guards. It was also used by staff to sleep off drunkenness—particularly by Officer Yvonne Walker, the officer in charge of the evening shift. There was also testimony that one of the inmates, Jacky Newby, was threatened by a guard jealous of Newby's sexual relationship with evening-shift guard Quida Graham.

Daskalea repeatedly complained to the authorities about sexual harassment. She filed more than fifteen official Internal Grievance Procedure Forms and wrote letters directly to, among others, the Deputy Warden, Warden, and Director Moore. She also wrote to the judge in her criminal case, who held a hearing at which Daskalea's complaints of sexual harassment were aired. Notwithstanding the judge's written recommendation that "defendant be moved from D.C. Jail," J.A. at 484 (commitment order), she was not. Nor did prison authorities intervene in any other way to stop the abuse.

All of the above turned out to be a mere prelude to the events of July 20, 1995.

---

**2.** This recitation of facts is taken from the testimony of plaintiff's witnesses, which stands largely unrebutted because the District did not offer any evidence of its own. Even if that were not the case, when reviewing a

jury's verdict we must adopt the version of the facts most favorable to the party prevailing below. *See Kirkland v. District of Columbia,* 70 F.3d 629, 635 (D.C.Cir.1995).

During the weeks preceding that date—on at least three occasions and perhaps as often as weekly—Officer Walker, the head guard on the evening shift, organized a series of evenings during which female inmates stripped and danced provocatively to loud music. Both female and male guards were present and, according to the testimony at trial, some guards assaulted inmates who refused to dance.

On the evening of July 20, the Jail's cell doors were kept open because the air conditioning system was malfunctioning. Sometime that evening, while plaintiff was sitting in her cell, loud music began and inmates started moving to the dining area. Daskalea followed, arriving late and standing at the back of the crowd. There, at the center of attention, was Officer Walker, doing a handstand on one of the dining tables and gyrating her hips provocatively. Soon, at Walker's instigation, three inmates climbed onto the table and began dancing, completely naked, while the crowd cheered. One of the dancing inmates performed a lewd act, and Officer Walker placed her head between the inmate's legs to get a closer look. By that point, all of the inmates, numerous female guards, and several male guards and maintenance workers were in attendance.

Then, someone called out Daskalea's name. Fearing what might be coming, plaintiff fled back to her cell, but was unable to close the door. A few minutes later, Officer Walker bellowed out the command: "Get Sunday down here!" The crowd began chanting Daskalea's name, and the dancing stopped. Two inmates pulled plaintiff out of her cell, one taking each arm while a third followed behind preventing escape. The inmates dragged Daskalea to the center of the crowd. Officer Walker commanded her to dance, and when Daskalea hesitated, Walker visibly angered. Afraid, Daskalea complied. She removed all of her clothes except for her underwear and attempted to dance to the music. But she was in such a state of shock and fear that her legs trembled.

Guards began shouting and clapping; some flashed money. Officer Walker tried to get Daskalea to remove her underwear. An inmate began rubbing baby oil all over Daskalea's body. The inmate then began rubbing her own body against Daskalea's. Plaintiff lost control of her legs and collapsed to the ground. The other inmate lay on top of her. Eventually, the guards permitted Daskalea to take her clothes and return to her cell. Later that night, both guards and inmates approached her, communicating sexual interest. One guard exposed herself to Daskalea while telling her how much she enjoyed the dance.

During the next few days, word spread about the incident. When inmate Newby submitted a grievance complaining of sexual harassment, assault, and threats by correctional officers, Lt. Edward Given "counseled" Newby to mind her own business. Subsequently, Daskalea was summoned to the office of a Mr. Lytle, who asked her about the forced striptease. Although Daskalea expressed concern that guards would retaliate against her if she discussed it, Lytle assured her that they would not.

Just days later, however, an officer arrived at Daskalea's cell and demanded that she turn over all of her underwear as "contraband." Plaintiff's request to talk to Lytle was ignored. A lieutenant appeared, told Daskalea she was going to solitary, and when she protested threatened to mace her. She was then placed in solitary confinement, without any of her belongings and, at first, without a mattress. A guard who went back to Daskalea's cell to retrieve her personal items, including her legal papers, found another guard going through them. The second guard told the first that Daskalea would not be getting them back.

Daskalea's requests to call an attorney were refused. She wrote a letter to the Warden to report the forced stripping. When she subsequently saw the Warden, however, he brushed her off and turned away.

The Warden appointed a committee, headed by Acting Deputy Warden Brenda Makins, to investigate the nude dancing incidents. When the Makins' Committee asked to speak with Daskalea in early August—at which time she was being held in solitary confinement—it was informed that she had already been discharged. The Committee concluded that Daskalea had been forced to dance for the assemblage (including both female and male guards) against her will, and that nude dancing had taken place on three earlier dates the same month. The Makins Report named fourteen guards who had "aided and abetted" the "sexual misconduct" and/or "assault." These included the lead guard, Officer Walker, who was also found to have attacked another prisoner while the prisoner was hand-cuffed and in the presence of other guards. In addition, the Committee concluded that eight officers, ranging from corporals to lieutenants, had been negligent, and that the "misconduct/assault was effected due to," among other things, "poorly trained supervisors." The Committee further found that officers had tried to cover up the incidents by providing it with false information. At trial, Director Moore testified that she had never read the Makins Report.

## B

Daskalea was released from prison at the end of August 1995. On October 30, 1996, she filed a lawsuit alleging violations of her civil rights under 42 U.S.C. § 1983. Her second amended complaint added common law claims of negligent supervision and intentional infliction of emotional distress. The parties agreed to refer the case to a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c)(1).

At trial, the named defendants were the District of Columbia and Director Moore. Daskalea testified on her own behalf, along with other inmates and six former or present Department of Corrections employees. Among the latter were Brenda Makins, head of the investigatory committee,

whose report was introduced into evidence. Daskalea also called as a witness defendant Moore, who, among other things, testified about the district court's findings and order in the *Women Prisoners* case; the order itself was entered into evidence. Defendants introduced no evidence. The jury found them liable on all counts and awarded $350,000 in compensatory damages and $5 million in punitive damages. Defendants moved for judgment as a matter of law or, in the alternative, for a new trial or remittitur on the ground that the damages award was excessive. The court denied the motion.

In this court, defendants press most of the arguments they advanced below. In particular, they deny liability under section 1983, deny liability under the common law of the District, assert immunity against punitive damages, and contend that Director Moore cannot be held personally liable because she was sued solely in her official capacity. We consider each of these contentions below.

## II

We begin with an examination of the issues raised by the District regarding the jury's finding of liability and award of damages under 42 U.S.C. § 1983.

## A

Section 1 of the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1983, provides a cause of action for monetary damages and injunctive relief against "[e]very person who, under color of [law] ... subjects or causes to be subjected, any person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution...." The District does not dispute that the guards who assaulted and tormented plaintiff violated her Eighth Amendment right to be free of "cruel and unusual punishments." U.S. Const. amend. VIII; *see Hudson v. McMillian,* 503 U.S. 1, 7–9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (holding Eighth Amendment is

violated, even in the absence of serious injury, when guard uses force against prisoner maliciously and sadistically to cause harm, rather than in good-faith effort to maintain discipline); *Schwenk v. Hartford,* 204 F.3d 1187, 1196–97 (9th Cir.2000) (holding guard's attempted rape of prisoner constituted Eighth Amendment violation). The only question is whether the District may be held liable for that violation.[3]

■ There is also no disagreement over the appropriate standard for determining whether the District may be held liable. In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court ruled that a municipality is a "person" who can be held liable under section 1983, but only when the municipality's "policy or custom . . . inflicts the injury." *Id.* at 694, 98 S.Ct. 2018. In subsequent cases, the Supreme Court and this court have held that a city's inaction, including its failure to train or supervise its employees adequately, constitutes a "policy or custom" under *Monell* when it can be said that the failure amounts to " 'deliberate indifference' towards the constitutional rights of persons in its domain." *City of Canton v. Harris,* 489 U.S. 378, 388–89 & n. 7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (recognizing municipal liability under § 1983 for failure to train adequately); *see Rogala v. District of Columbia,* 161 F.3d 44, 56 (D.C.Cir.1998) (recognizing liability for failure to train or supervise); *Triplett v. District of Columbia,* 108 F.3d 1450, 1453 (D.C.Cir.1997) (noting that "inaction giving rise to or endorsing a custom" can be basis of § 1983 liability).[4]

■ The District has no objection to the manner in which the jury was charged on the question of municipal liability. Its only contention is that there was insufficient evidence upon which to base a find-

ing of deliberate indifference, and that the magistrate should therefore have granted its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). We review de novo a trial court's ruling on such a motion. *See United States ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 735 (D.C.Cir.1998). Because granting judgment as a matter of law "intrudes upon the rightful province of the jury, it is highly disfavored." *Id.* (quoting *Boodoo v. Cary,* 21 F.3d 1157, 1161 (D.C.Cir.1994)). It "is warranted only if 'no reasonable juror could reach the verdict rendered in th[e] case.' " *Id.* (quoting *Anderson v. Group Hospitalization, Inc.,* 820 F.2d 465, 473 (D.C.Cir.1987)).

■ We conclude that the jury had more than sufficient evidence upon which to base its finding of deliberate indifference. Only seven months prior to Daskalea's forced striptease, a federal district court had found the District liable under section 1983 for being deliberately indifferent to the repeated sexual abuse and harassment of women prisoners by D.C. correctional officers. The court noted a failure to train officers to prevent such misconduct, and ordered the District to take all steps necessary to prevent sexual harassment of female prisoners, including the institution of mandatory training. Given this history, the District and its policymakers were on notice that D.C. guards lacked basic respect for the rights of female inmates, and that absent substantial intervention, the pattern of unconstitutional behavior would persist.

Notwithstanding the court's unequivocal findings and order, the sexual abuse of women prisoners at Southeast 1 continued in an open and notorious manner. The use of the library for sexual trysts between guards and inmates was well known. Nude dancing incidents, accompanied by

---

**3.** Although plaintiff's complaint also asserted violations of due process and equal protection under the Fifth Amendment, only the Eighth Amendment issue was submitted to the jury.

**4.** *See also Atchinson v. District of Columbia,* 73 F.3d 418, 419 (D.C.Cir.1996) (failure to train); *Parker v. District of Columbia,* 850 F.2d 708, 712 (D.C.Cir.1988) (same).

blaring music and raucous crowds, took place on a regular basis. There was no evidence that a training program or any other corrective measure was implemented. Daskalea repeatedly complained of sexual abuse, sending grievance forms and letters to everyone from correctional officers to the Deputy Warden, Warden, and Director of the Department. Given the notice afforded by the *Women Prisoners* order and Daskalea's own letters, and the open and notorious nature of the continued abuse, a jury could reasonably have concluded that the District was deliberately indifferent to the constitutional rights of its women prisoners. *See Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197 (recognizing municipal liability where officers "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers"); *Atchinson,* 73 F.3d at 421 (same); *see also Board of County Comm'rs v. Brown,* 520 U.S. 397, 407–08, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (recognizing that "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training ... is the 'moving force' behind the plaintiff's injury"); *id.* at 407, 117 S.Ct. 1382 (noting that "municipal decisionmakers['].... continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action— the 'deliberate indifference'—necessary to trigger municipal liability").

Finally, the jury had additional, direct evidence from which it could have concluded that the District's policymakers were indifferent to the plight of women in the Jail, and specifically to the plight of Sunday Daskalea. Margaret Moore, Director of the Department of Corrections, testified at the trial. Notwithstanding the notoriety of the incident, Moore conceded that she had not read the Makins Report and had not familiarized herself with the events at issue. Moreover, notwithstanding the findings of the report, Moore pronounced herself unaware of the multiple nude dancing incidents that preceded Daskalea's humiliation, and she took no action to protect Daskalea from the subsequent harassment and solitary confinement that a jury reasonably could have regarded as retaliation for Daskalea's complaints.

The District's principal defense to section 1983 liability is that, because the abuses in this case were committed by female guards, while those in *Women Prisoners* were committed by males, *Women Prisoners* did not sufficiently put it on notice of the kind of constitutional violations that Daskalea would suffer. We reject this argument as cutting the notice issue much too finely. Moreover, its premise is factually inaccurate: several of the incidents in this case did involve male-on-female harassment. To take but three examples: the librarian who demanded sexual favors of Daskalea was a male; the guard who brought her to the library to be attacked by a male prisoner was a male; and the group of guards and other employees who were "entertained" by Daskalea's forced striptease included several males.

■ The District also attempts to turn the very court order that required it to issue a harassment policy into a defense against liability for its guards' harassment. Because the Department of Corrections eventually did issue such a policy, the District argues, it is clear that sexual harassment was against District "policy" and hence may not be the subject of a section 1983 action. This argument has two flaws. First, the policy upon which the District relies was not issued until well after many of the events of which Daskalea complains. Second, a "paper" policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation. *See Ware v. Jackson County,* 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are nei-

ther followed nor enforced."). That evidence included not only the continued blatant violation of the policy, but also the fact that the policy was never posted, that some guards did not recall receiving it, that inmates never received it, and that there was no evidence of the training that was supposed to accompany it. Indeed, the Department purportedly had a "policy" against sexual harassment even before the court order in *Women Prisoners*—a policy that court found to have been "of little value." 877 F.Supp. at 640.

██ The District makes one further attempt at legal jujitsu—trying to turn Daskalea's evidence against her by arguing that the very fact that guards sought to conceal the July 20 incident is proof that the abuse was only undertaken "by a small group of rogue employees, acting surreptitiously." Reply Br. at 16. In *Triplett v. District of Columbia*, we did note that "[c]over-up efforts at relatively low levels in the hierarchy not only reduce the likelihood that policymakers will learn of the covert practice, but suggest a belief by the subordinates that their behavior violates established policy." 108 F.3d 1450, 1453 (D.C.Cir.1997). But here the misconduct can hardly be described as that of a few "rogues." The District's own investigative committee charged fourteen guards with "aiding and abetting" sexual misconduct and/or assault, and charged several more—including supervisors and lieutenants—with negligence. Moreover, whatever the participants did to cover up the July 20 incident, the series of bacchanalian nights that preceded it was open and notorious, and the jury could reasonably have concluded that if such behavior were not known to prison policymakers, it was only because of their deliberate indifference to conditions at the Jail. Accordingly, we

affirm the jury's verdict against the District under 42 U.S.C. § 1983.[5]

**B**

██ The District urges that even if we affirm the jury's finding of liability, we should grant a new trial with respect to the amount of the compensatory damages award. We review trial courts' rulings on motions for new trial only for an abuse of discretion. *See Langevine v. District of Columbia,* 106 F.3d 1018, 1023 (D.C.Cir. 1997). A jury award must stand unless it is "beyond all reason" or "so great as to shock the conscience." *Williams v. Steuart Motor Co.,* 494 F.2d 1074, 1085 (D.C.Cir.1974). "Courts may not set aside a jury verdict merely deemed generous; rather, the verdict must be so unreasonably high as to result in a miscarriage of justice." *Langevine,* 106 F.3d at 1024 (citing *Barry v. Edmunds,* 116 U.S. 550, 565, 6 S.Ct. 501, 29 L.Ed. 729 (1886)). And remittitur of a jury verdict is appropriate only if the verdict "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Id.* at 1024 (internal quotation omitted); *see Carter v. District of Columbia,* 795 F.2d 116, 135 n. 13 (D.C.Cir.1986).

██ The District argues that there was insufficient evidence to justify a compensatory award of $350,000 because Daskalea "suffered no physical injury," because her damages evidence was limited to her own testimony, and because she did not establish a "causal link" between the unlawful acts and the harm she suffered. We disagree.

██ First, it is well established that "mental and emotional distress" are "compensable under § 1983," even in the absence of physical injury. *Carey v. Piphus,*

---

5. The District also contends that proof of its adherence to the harassment policy is demonstrated by the fact that employees were disciplined for its violation. But while there was some evidence that discipline *followed* the July 20 incident, too late to be of any comfort to Daskalea, the only person identified as having been terminated was Brenda Makins— the author of the investigative report that found serious wrongdoing at the Jail—allegedly because she had lied about her home address.

435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *see Gray v. Spillman,* 925 F.2d 90, 94 (4th Cir.1991) (noting that "even in the absence of physical injury," plaintiff may prove actual damages under § 1983 "based on injuries such as 'personal humiliation' and 'mental anguish and suffering'") (quoting *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)). Moreover, Daskalea plainly did suffer "physical" injury through sexual assault. If what the District means is that she did not suffer *permanent* injury from such attacks, we emphatically disagree with the proposition that a person may not recover damages for a constitutional violation unless she suffers lasting physical harm.

■■■ Second, no expert testimony was required to bolster that of Daskalea and her witnesses, or to show the causal link between her treatment in prison and her injuries. *See Price v. City of Charlotte,* 93 F.3d 1241, 1251 (4th Cir.1996) ("A survey of the case law reveals that a plaintiff's testimony, standing alone, may support a claim of emotional distress precipitated by a constitutional violation.") (collecting cases). The unrebutted evidence showed that she was subjected to continuing sexual abuse and harassment, was denied library assistance because she refused to have sex with the librarian, was set up by correctional officers to be assaulted, was attacked with the assistance of correctional officers, was forced to perform a striptease for guards and inmates, and thereafter was confined in isolation without underwear or a mattress. Daskalea testified that, as a result, she felt constant stress, anxiety, and dread of imminent sexual attack. She had to sleep during the day for fear of what the guards might do at night. After her release, she suffered from insomnia and eating disorders, and spent months emotionally and psychologically debilitated, withdrawn, and depressed. These injuries are hardly surprising or unexpected in light of the abuse Daskalea suffered, and it does not take an expert to confirm the jury's common sense with respect to both their existence and cause.

■■■ Finally, we have no basis for questioning the amount of the jury's award. The jury's valuation of Daskalea's damages "was neither beyond all reason nor so great as to shock the conscience." *Langevine,* 106 F.3d at 1024 (affirming award of $200,000 under § 1983 for, inter alia, pain, suffering, humiliation, and emotional distress, despite only minor physical injury arising from single incident). Indeed, a "court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Id.* The magistrate's denial of the District's motion for a new trial is therefore affirmed.[6]

### III

In addition to finding the District liable for violating section 1983, the jury found it liable on Daskalea's pendent claim for negligent supervision under the common law. The damages verdict did not distinguish between the grounds for liability, and Daskalea concedes that both theories represented attempts to impose liability for the same predicate acts. The District challenges this ground for liability as well.

■■■ Under District of Columbia law, prison authorities have "a duty to exercise reasonable care under the circumstances in the protection and safekeeping of prisoners," *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988), including the duty "to use reasonable care in supervising and controlling" their employees, *Morgan v.*

**6.** The District contends that a new trial should also be granted because the magistrate judge wrongly denied it an opportunity to cross-examine Daskalea as to whether some of the stress she suffered was actually caused by her alleged post-release activities as an informant. We review such a claim only for abuse of discretion. *See United States v. White,* 116 F.3d 903, 919 (D.C.Cir.1997). The magistrate found the District's proposed cross-examination to be both irrelevant and prejudicial, and we perceive no error.

*District of Columbia,* 449 A.2d 1102, 1108 & n. 3 (D.C.1982), *rev'd on other grounds,* 468 A.2d 1306 (1983) (en banc).[7] The District may be held liable for damages caused by its negligence in carrying out that duty. *See Finkelstein v. District of Columbia,* 593 A.2d 591, 594–95 (D.C.1991) (holding District liable for negligence in death of prisoner). That the District negligently supervised its employees in this case is an a fortiori conclusion from the finding, discussed in Part II.A. above, that the District displayed deliberate indifference with respect to the treatment of women prisoners by correctional officers.

 ▮ The District's only real challenge to liability for negligent supervision is its claim that proof of the standard of care requires expert testimony, which Daskalea did not offer. That, however, is not the law of the District of Columbia. To the contrary, the rule is that "[p]roof of a deviation from the applicable standard of care need not include expert testimony where the alleged negligent act is 'within the realm of common knowledge and everyday experience.'" *Toy,* 549 A.2d at 6 (quoting *District of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982)). Expert testimony is required only "where the subject presented is 'so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson.'" *Id.* (quoting *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C. 1987)).

 ▮ It is true that in cases involving assaults on prisoners by fellow prisoners, the District of Columbia Court of Appeals has held expert testimony necessary to establish the standard of care for "secur[ing] the safety of an inmate," because a "reasonably prudent juror cannot be expected to appreciate the ramifications of prison security." *District of Columbia v. Carmichael,* 577 A.2d 312, 314 (D.C.1990) (quoting *Hughes,* 425 A.2d at 1303); *cf.*

*Toy,* 549 A.2d at 9 (holding expert testimony necessary to establish standard of care for administration of cardiopulmonary resuscitation). But it does not take an expert to establish that the District was negligent in permitting the kind of persistent, open and notorious conduct at issue here. Surely a juror could reasonably conclude that the District had been negligent (at best) when it failed to notice, let alone stop, a continuing series of evening stripteases, accompanied by blaring music and guard-on-inmate violence. *See Morgan,* 449 A.2d at 1106, 1109 (stating that expert testimony is not required to establish "standard of care for control and supervision of police officers" because "[d]iscipline of police officers ... is not a matter which laymen are incapable of intelligently evaluating without the assistance of expert testimony") (internal quotation omitted).

Nor did Daskalea's jury have to rely only upon its common sense. As we have noted, the Department's own investigating committee concluded that eight officers, ranging from corporals to lieutenants, had been negligent, and that the "misconduct/assault was effected due to," among other things, "poorly trained supervisors." Moreover, Patricia Jackson, Deputy Warden at the time of the events in question, testified that she agreed with the committee that the supervision had been inadequate, that officers were negligent, and that the Jail was grossly negligent in protecting women from sexual misconduct.

The District also attacks the amount of damages awarded for negligent supervision, noting that the District of Columbia Code bars local law claims against the District unless, within six months after the injury, the potential claimant gives notice in writing of the "circumstances." D.C.Code § 12–309; *see Gross v. District of Columbia,* 734 A.2d 1077, 1081 (D.C. 1999). Because Daskalea did not send the

---

**7.** *See Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991); *District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.1987);

*Hughes v. District of Columbia,* 425 A.2d 1299, 1302 (D.C.1981).

required notice until November 21, 1995, the District contends she cannot recover for any injuries suffered before May 21 of that year. We need not resolve the merits of this contention, however, as it has no bearing on the result in this case. The six-month notice requirement of the D.C. Code does not apply to plaintiff's claim under section 1983, *see Brown v. United States,* 742 F.2d 1498, 1509 (D.C.Cir.1984) (en banc), and that cause of action therefore provides an independent basis for the full amount of the damages award.[8]

## IV

In addition to compensatory damages, the jury awarded Daskalea $5 million in punitive damages for her D.C. common law claims. In this Part, we consider the permissibility of that award.

Daskalea did not seek punitive damages under 42 U.S.C. § 1983, conceding that she was not eligible for them in light of the Supreme Court's decision in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). *See* Daskalea Br. at 19. In *Fact Concerts,* the Court considered whether punitive damages may be awarded against municipalities under section 1983. It began by noting that municipalities had long been held immune from punitive damages under the law of the "vast majority" of the states. 453 U.S. at 259–60, 101 S.Ct. 2748. It then surveyed the rationales for that result, declaring that "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff[,] are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill," and punish only the "blameless or unknowing taxpayers" rather than the true wrongdoer, the offending government official. *Id.* at 267, 101 S.Ct. 2748. Finding the same principles applica-

ble to suits brought under section 1983, the Supreme Court concluded that "a municipality is immune from punitive damages" under that statute as well. *Id.* at 271, 101 S.Ct. 2748. In a footnote, the Court preserved a potential exception: "It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights." *Id.* at 267 n. 29, 101 S.Ct. 2748

The District contends that it is immune from punitive damages for the common law tort of negligent supervision, just as it is for a violation of section 1983. As the District points out, the D.C. Court of Appeals has never permitted such an award. In *Smith v. District of Columbia,* 336 A.2d 831 (D.C.1975), a case decided before *Fact Concerts,* the Court of Appeals rejected a claim against the District for punitive damages resulting from false arrest and assault. The court noted that "[t]he clear weight of authority in the states is that as a general rule there can be no recovery of punitive damages against a municipality absent a statute expressly authorizing it." 336 A.2d at 832. It then proceeded to quote six paragraphs from a Florida Supreme Court opinion explaining the rationales for such immunity—rationales similar to those later surveyed by the U.S. Supreme Court in *Fact Concerts. See* 336 A.2d at 832 (quoting *Fisher v. City of Miami,* 172 So.2d 455, 457 (Fla.1965)).[9] On the basis of the Florida court's rationales, the D.C. Court of Appeals concluded: "Absent extraordinary circumstances not present here, we agree with the weight of authority and conclude the District of Columbia is not liable for punitive damages." *Id.* at 832.

The District argues that notwithstanding the Court of Appeals' caveat—"absent extraordinary circumstances not present

---

8. For the same reason, we need not address Daskalea's common law claim of intentional infliction of emotional distress, which involves the same predicate acts and produces no difference in the damages award.

9. *Fact Concerts* cited both *Smith* and *Fisher* as examples of "[j]udicial disinclination to award punitive damages against a municipality." 453 U.S. at 260 & n. 21, 101 S.Ct. 2748.

here"—punitive damages are *never* available against the District for wrongs committed by its employees. That argument is not without support. The Florida opinion upon which *Smith* rested held municipalities wholly immune in the absence of a legislative authorization. *See Fisher,* 172 So.2d at 457. And in a subsequent en banc opinion, the D.C. Court of Appeals stated, this time without qualification, albeit in dictum, that: "punitive damages may not be awarded against the District of Columbia." *Finkelstein v. District of Columbia,* 593 A.2d 591, 599 (D.C.1991) (en banc) (citing *Smith,* 336 A.2d at 832). The following year, the court again rejected a claim for punitive damages against the District, citing *Fact Concerts* as "reaffirming [the] common law principle that municipalities [are] immune from punitive damages." *Ramos v. District of Columbia Dep't of Consumer and Regulatory Affairs,* 601 A.2d 1069, 1074 n. 9 (D.C.1992).

██ We need not go as far as the District urges to resolve this case. Even if the D.C. Court of Appeals would permit punitive damages in some not-yet-presented category of "extraordinary" cases, we are unable to conclude that this case would fit within that category. That is not, in any way, to minimize the offensiveness of the District's conduct here. But this is not a case that falls within the exception noted in *Fact Concerts,* where a jurisdiction's taxpayers are directly responsible for perpetrating the policies that caused the plaintiff's injuries. Nor is this a case where a municipality or its policymakers have intentionally adopted the unconstitutional policy that caused the damages in question.[10] Rather, this is a case where the charge against the District is "deliberate indifference," and the D.C. Court of Appeals has given no hint that it would

permit an award of punitive damages in such a case—if it would permit such an award at all. Because our role in deciding a pendent District of Columbia claim is only to ascertain what District law is, "not what it ought to be," *Women Prisoners,* 93 F.3d at 922 (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)), we are unable to do for Daskalea what the D.C. Court of Appeals has never done for any plaintiff.

## V

The other named defendant in this case, Margaret Moore, served at all relevant times as the Director of the D.C. Department of Corrections. The jury returned a general verdict finding "defendants" liable on all counts. Moore and the District contend that Moore was sued solely in her official capacity, and hence cannot be held personally liable for the damages award. Daskalea contends that she sued Moore in her individual (personal) capacity, and that Moore therefore is liable not only for the $350,000 in compensatory damages, but also—because she is not an immune municipality—for $5 million in punitive damages. *See generally Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (holding that a government official may be held personally liable only if sued in an individual rather than official capacity); *Atchinson v. District of Columbia,* 73 F.3d 418, 424 (D.C.Cir.1996) (same); *Eskridge v. Jackson,* 401 A.2d 986, 989 n. 7 (D.C.1979) (same under D.C. law); *Keith v. Washington,* 401 A.2d 468, 470–71 (D.C.1979) (same). The magistrate judge agreed with Daskalea and held Moore personally liable for the entire amount of both awards.

---

10. *Cf. Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 2125–26, 144 L.Ed.2d 494 (1999) (noting that "[t]he justification of exemplary damages lies in the evil intent of the defendant") (internal quotation omitted); *Rieser v. District of Columbia,* 563 F.2d 462, 481–82 (D.C.Cir.1977) (declining to

find "extraordinary circumstances" justifying punitive damages against District, notwithstanding parole officers' breach of duty leading to murder of plaintiff's daughter), *vacated then reinstated in relevant part by en banc court,* 580 F.2d 647 (D.C.Cir.1978).

■ Neither the complaint nor any other pleading filed by plaintiff indicates whether Moore was charged in her official or her individual capacity. In some circuits, that would be the end of the matter, as they require a plaintiff who seeks personal liability to plead specifically that the suit is brought against the defendant in her individual capacity.[11] Although it has not definitively resolved the issue, *see Hafer v. Melo*, 502 U.S. 21, 24 n. *, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), the Supreme Court has typically looked instead to the "course of proceedings" to determine the nature of an action. *See Graham*, 473 U.S. at 167 n. 14, 105 S.Ct. 3099; *Brandon v. Holt*, 469 U.S. 464, 469, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Following the Supreme Court's lead, this circuit has joined those of its sisters that employ the "course of proceedings" approach. *See Atchinson*, 73 F.3d at 425.[12] Like the Supreme Court, however, we remind litigants that "it is obviously preferable for the plaintiff to be specific in the first instance to avoid any ambiguity." *Hafer*, 502 U.S. at 24, 112 S.Ct. 358 (internal quotation omitted).

■ We conclude that the course of proceedings in this case neither put Moore on notice that she was being sued in her individual capacity, nor evidenced her understanding that her personal liability was at stake. As noted, the complaint itself did not give her such a warning, stating only that "Defendant Moore is the Director of the D.C. Department of Corrections and is responsible for the overall operation of that Department and each institution of which it is comprised, including the D.C. Jail." Nor did the complaint seek to hold the defendants jointly and severally liable, a formulation that might have given some indication of an intention to sue Moore in her personal capacity. *See Atchinson*, 73 F.3d at 425. Indeed, at several points the complaint refers to "defendant's failure" in the possessive singular, suggesting that plaintiff viewed Moore and the District as interchangeable. *See* Compl. ¶¶ 21, 23, 25, 27.

■ Daskalea contends that the fact that Moore was named at all indicates an intention to hold her personally liable, because naming Moore would have added nothing to the available damages if she had been named only in her official capacity. Although the latter point is true, it does not prove the former. Complaints often include surplusage. Indeed, it is not uncommon for civil rights complaints to name both the municipality and an officer charged in his or her official capacity. On occasion this may be due to a misunderstanding of the law of section 1983, but it also may be done in an effort to "personalize" the otherwise faceless municipal entity being sued.[13]

Once the complaint was filed, attorneys for the District repeatedly expressed their understanding that Moore had been sued

---

**11.** *See Soper ex rel. Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir.1999) ("Generally, plaintiffs must designate in which capacity they are suing defendants; if not, by operation of law, defendants are deemed sued in their official capacities."); *see also Hafer v. Melo*, 502 U.S. 21, 24 n. *, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (citing *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir.1989); *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir.1989)).

**12.** *See Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir.1995) (examining "the nature of the plaintiff's claims, the relief sought, and the course of proceedings"); *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir.1994); *Frank v. Relin*, 1 F.3d 1317, 1326 (2d Cir. 1993); *see also Hafer*, 502 U.S. at 24 n. *, 112 S.Ct. 358 (citing *Houston v. Reich*, 932 F.2d 883, 885 (10th Cir.1991); *Melo v. Hafer*, 912 F.2d 628, 635–36 (3rd Cir.1990); *Conner v. Reinhard*, 847 F.2d 384, 394 n. 8 (7th Cir. 1988); *Lundgren v. McDaniel*, 814 F.2d 600, 603–604 (11th Cir.1987)).

**13.** The fact that the complaint sought punitive damages did not put Moore on notice that she was being sued in her individual capacity. Although we hold in Part IV that such damages are unavailable against the District (or against Moore if sued in an official capacity), Daskalea prosecuted the case on the understanding that punitive damages would be available against the District if she succeeded on a negligent supervision theory.

solely in her official capacity. District counsel expressed that understanding in their answer to the complaint. *See* J.A. at 511 (stating that Moore had been "sued solely in her official capacity"). They did so again in their trial brief, specifically noting that because plaintiff "has sued only the District and the Director of the Department of Corrections in her official capacity, plaintiff's claim is governed by the standards set forth in *Monell*." J.A. at 43. And they did so yet again, with great clarity, on four occasions during the trial.[14] Not once, prior to rebuttal argument, did Daskalea's attorney dispute opposing counsel's characterization of the nature of the case. To the contrary, plaintiff's own trial brief, which addressed only one claim, mentioned only a single defendant—the District of Columbia. *See* Pl. Trial Br. at 1 (Jan. 12, 1998).

Moreover, both Moore and her counsel plainly acted on the understanding that she had been sued solely in an official capacity. Moore did not hire separate counsel, but relied instead upon the District of Columbia Office of Corporation Counsel, which represented the District in the case. Although joint representation would not necessarily have been unusual even if Moore had been sued individually, it would have raised potential conflicts that would have had to have been addressed. *See Atchinson*, 73 F.3d at 427 ("[N]aming the officials in their individual capacities . . . may make continued joint representation problematic, if not impossible. A municipality and officials named individually may have mutually exclusive defenses.").

Corporation Counsel certainly defended the case as if Moore had nothing personally at risk. A government official sued under section 1983 has available to her the defense of qualified immunity, a defense unavailable in an official capacity suit. *See Graham*, 473 U.S. at 166–167, 105 S.Ct. 3099; *Atchinson*, 73 F.3d at 425. Corporation Counsel did not offer that defense on Moore's behalf, notwithstanding that it surely would have been at least colorable had she been sued individually. Nor did Corporation Counsel (or plaintiff's counsel, for that matter) seek to introduce evidence of Moore's personal finances, despite the fact that punitive damages awards are supposed to be based on a defendant's "personal financial resources." *Fact Concerts*, 453 U.S. at 269, 101 S.Ct. 2748; *see also Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 940 (D.C.1995). Other than assuming complete incompetence (as well as gross malpractice) on the part of Moore's attorneys, the only explanation for these lapses must have been their perception that Moore had been sued in her official capacity alone.

As against all of this, Daskalea draws our attention to a pretrial deposition at which counsel focused on the specifics of Moore's involvement, as well as to a pretrial conference at which her lawyer told lawyers for the District that "we're coming dead at your directors," and that "your Director was negligent." These events did not, however, serve to put Director Moore on notice that plaintiff was seeking to hold her individually liable: Moore's personal involvement, even her personal negligence, was equally relevant to proving the District's own deliberate indifference and negligent supervision.

Finally, Daskalea calls our attention to her counsel's closing rebuttal argument, during which he told the jury: "Margaret Moore is an actor here. Margaret Moore is responsible for this. Margaret Moore isn't some figurehead. . . ." Even if this were enough to make Moore's

---

14. Those four occasions were: (1) before jury selection, *see* Tr. at 8–9 (Court: "So it is only Margaret Moore?" D.C. Counsel: "In her official capacity."); (2) when Moore testified, *see* J.A. at 216 ("Ms. Moore is also named as a defendant in her official capacity."); (3) when moving for directed verdict at the close of plaintiff's evidence, *see* J.A. at 359 ("Margaret Moore's sued solely in her official capacity."); and (4) in closing argument, *see* Trial Tr. at 902 ("She is sued in this case in official capacity, which means that she's sued just because she's the head of the Department of Corrections.").

personal stake clear, it was simply too late to do so in a rebuttal argument—the last piece of advocacy prior to the jury's deliberations. By that time it was too late for Moore to hire separate counsel, to proffer a defense of qualified immunity, or to introduce evidence that her personal assets did not approach $5 million. Indeed, by that time it was too late for Moore's counsel to respond in any way at all. Such notice can hardly be characterized as fair. *See Atchinson,* 73 F.3d at 427–28 (affirming denial, due to concern for prejudice, of plaintiff's motion to amend complaint to name official in individual capacity shortly before trial). Accordingly, we reverse the award of damages against Moore in her individual capacity.

## VI

Sexual assault, forced naked dancing, and the other indignities borne by Sunday Daskalea at the District of Columbia Jail are "simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotation omitted); *see Women Prisoners,* 93 F.3d at 929. To the contrary, "when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being." *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Because the evidence at trial established that the District of Columbia wholly failed to live up to that responsibility, we affirm in full the jury's award of $350,000 in compensatory damages. At the same time, however, District law requires us to reverse the award of punitive damages, and plaintiff's failure to sue co-defendant Moore in her individual capacity means that the District alone is responsible for payment.