**Syed Azam QUTB, Plaintiff,**

v.

**Chief Charles RAMSEY, et al., Defendants.**

**No. CIV.A.02–0179(ESH).**

United States District Court, District of Columbia.

Oct. 1, 2003.

Edward J Elder, Andrea S Grill, Klimaski & Grill, PC, Washington, DC, Jamie Susan Davis Smith, Due Process of Law Foundation, Washington, DC, for Syed Azam Qutb.

Michael Alan Stern, Elizabeth Mary Burke, Office of Corp. Counsel, DC, Washington, DC, for Charles Ramsey, Diane Groomes.

Elizabeth C Burke, Office of Corp. Counsel, DC, Washington, DC, for Kevin Griffin, Lance Kashinsky, Eric Hampton, Kenny Taylor.

### *MEMORANDUM OPINION*

HUVELLE, District Judge.

Before the Court are cross-motions for partial summary judgment in this case which has been brought under 42 U.S.C. § 1983 and assorted provisions of the common law. The suit grows out of an encounter between plaintiff Syed Qutb and several officers of the Metropolitan Police Department (MPD) that occurred in a private parking lot near Dupont Circle in the early morning of February 4, 2001. Plaintiff alleges that the police searched, seized, and ultimately impounded his car, which he was never able to recover, in violation of both the Fourth and Fifth Amendments. He further alleges that during this encounter one of the officers assaulted him in violation of the Fourth Amendment. For the reasons given below, the Court will grant in part and deny in part defendants' Motion for Partial Summary Judgment, and will deny plaintiff's Motion for Partial Summary Judgment.

## BACKGROUND

The events giving rise to this case began on February 4, 2003, at approximately 12:43 a.m. when the MPD received a call from an unidentified person reporting a "peeping Tom" incident in progress in a parking lot located along the 1700 block of Church Street, NW. The caller described a dark-complexioned male sitting in a red, maroon, or brown car who appeared to be peering into nearby houses with binoculars. Several officers, supervised by MPD Lieutenant Diane Grooms, responded to the call. When they arrived on the scene, they found plaintiff, who matched the description given by the lookout, sitting on the seat of his vehicle, a 1989 Volkswagen Jetta, which was parked in the lot, but not in a marked space. The officers questioned plaintiff about the alleged voyeurism, but he refused to answer their queries and consistently maintained that he was doing nothing wrong. (Dep. of Syed Qutb Dep. [Qutb Dep.] 82:2–8; Dep. of Diane Groomes [Groomes Dep.] 34:18–21.) They then ran a license and registration check on the car, which revealed that plaintiff was the lawful owner but did not reside in the area. At some point, one of the officers saw a pair of binoculars in the car and removed them. (The parties dispute the extent to which the rest of the car, including the trunk, was searched, but this dispute is ultimately immaterial to the legal claims that plaintiff now pursues.) Nevertheless, for reasons that are not altogether clear, the officers decided not to arrest plaintiff in connection with the incident.

Instead, they decided to take action against plaintiff's automobile. According to Lieutenant Groomes, she told plaintiff several times that his car would be ticketed and towed if he refused to leave, and indeed that he could still be arrested if he did not do so. Plaintiff persisted in maintaining his innocence and his right to stay where he was. (Groomes Dep. 39:12–40:16; 111:12–15.; Dep. of Lance Kashinsky [Kashinsky Dep.] 20:20–21:12.) Ultimately, the officers demanded that plaintiff surrender the keys to his car, which he did. (Pl.'s Stat. of Material Facts Not in Dispute ¶ 15–17.) Then, at approximately 1:00 a.m., Groomes wrote up a citation for illegally parking on private property; which she placed on the car's windshield. (Defs.' Stat. of Material Facts Not in Dispute ¶ 8.) It is disputed whether plaintiff was still on the scene at this point, but in any event he was not personally served with the citation.[1] (Groomes Dep. 111:4–7.) Thereafter, Lieutenant Groomes requested that the police dispatcher send a tow-crane operator to remove plaintiff's car from the Church Street lot. Responding promptly to this call, a private towing company, ANT Towing (also known as John–John Inc.), towed the vehicle. Although other cars were parked in the lot, only plaintiff's car was issued a citation and only plaintiff's car was towed. At no time that night did the officers contact the lot owner to determine whether plaintiff had permission to park there or whether the owner wished plaintiff's car to be towed. Nor had the owner previously executed a written agreement authorizing the towing of vehicles parked illegally there. (Pl.'s Stat. ¶¶ 33–34.)

Plaintiff maintains that he had left the lot while this activity was taking place, having been effectively chased away by the officers, and that, by the time he returned, his car, unbeknownst to him, had already been towed. (Qutb Dep. 95:5–14.) After unsuccessfully searching the nearby area for the vehicle, he tried to report by phone that it had been stolen. He was told that he would have to file a report in person at the Third District, which he did on February 10, 2001. (Plaintiff alleges, but defendants dispute, that the police never told him either the name of the towing company or the location to which the vehicle had been towed.) Plaintiff never was able to recover his car; nor has he even been able to definitively ascertain its whereabouts. The District has acknowledged that it does not know where the vehicle is and has confirmed that it will not be able to return the car to plaintiff. Indeed, according to information provided by the towing company, plaintiff's car was "junked" in April 2001. (Pl.'s Mot. for Summ. J., Ex. 23.)

Thus stymied, plaintiff filed the present action on February 1, 2002. He named as defendants the District of Columbia, Chief Charles Ramsey,[2] Lieutenant Groomes, as well as five other MPD officers who were present at the Church Street lot on February 4, 2001—Kevin Griffin; Lance Kashinsky; Eric Hampton; Jermaine Wilson; and Kevin Taylor. In his Second Amended Complaint, plaintiff asserts a variety of common law claims—assault and battery (Count 1), conversion (Count 2), fraud and

---

**1.** Lieutenant Groomes testified that plaintiff was standing across the street while the officers were writing up the ticket (Groomes Dep. 48:21–49:2) and that he then came back to look at the ticket that had been placed on the windshield (*id.* at 111:10–11.) At that point, according to this version of events, the officers asked plaintiff for the final time what he was doing on the lot. Once again, he refused to answer, choosing instead to gather his belongings from the car and leave on foot. (*Id.* at 111:12–15.)

**2.** The Court dismissed Chief Ramsey as a defendant by Order issued February 7, 2003.

deceit (Count 3), unjust enrichment (Count 4), negligent training/supervision and respondeat superior as to the District (Counts 5–6), and intentional infliction of emotional distress (Count 8)—along with federal claims under § 1983 for violations of the Fourth Amendment right to be free from illegal searches and seizures and of the Fifth Amendment right to be free of deprivations of property unaccompanied by due process of law (Count 7). These statutory claims are directed at both the individual officers and the District, the latter based on the city's policies and customs with respect to the seizure and towing of cars parked on private property. (Sec.Am. Compl.¶ 112.)

Defendants have now moved for partial summary judgment on the following claims: (1) the § 1983 claim based the search of the vehicle by Officers Wilson and Kashinsky;[3] (2) the § 1983 claim based on the use of excessive force by Officer Wilson; (3) the § 1983 claim based on the seizure and towing of the vehicle; (4) the § 1983 claims against the District based on a theory of municipal liability; (5) assault and battery; (6) unjust enrichment;[4] (7) intentional infliction of emotional distress. Defendants have also asked the Court to dismiss plaintiff's claim for punitive damages. For his part, plaintiff has moved for summary judgment on the § 1983 claim based on the seizure and towing of the car, including on the issue of municipal liability. The Court now turns to the merits of these various arguments.

## ANALYSIS

### I. *Summary Judgment Standard*

The standard for reviewing a motion for summary judgment is well known and readily stated. Under Fed.R.Civ.P. 56, summary judgment is to be granted where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine, and should preclude summary judgment, if a reasonable jury could return a verdict in favor of the non-moving party. *Id.* In contrast, the moving party is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C.Cir.2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Washington Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989). Howev-

---

3. Defendants argue in their motion that the search of plaintiff's car at the parking lot did not violate the Fourth Amendment, because that search was supported by probable cause. (Defs.' Mot. for Summ. J. at 10–13.) Plaintiff has not responded to this argument, and thereby concedes that summary judgment is appropriate as to this aspect of his § 1983 claim.

4. Plaintiff also does not respond to defendants' arguments that his unjust enrichment claims are without merit. The Court will therefore treat these arguments as conceded and grant summary judgment on this count as well.

er, the nonmoving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Therefore, while the court "must assume the truth of all statements proffered by the party opposing summary judgment," it need not consider wholly conclusory statements for which no supporting evidence is offered. *Greene v. Dalton,* 164 F.3d 671, 674–75 (D.C.Cir.1999).

## II. *The Seizure of Plaintiff's Car*

The central issue in this case concerns whether the towing and continued seizure of plaintiff's car violated, respectively, the Fourth and Fifth Amendments. Plaintiff has moved for summary judgment on both claims; defendant has moved for summary judgment only on the Fifth Amendment claim.

### A. Fourth Amendment

 Plaintiff first contends that the initial towing of his car was an unreasonable seizure prohibited by the Fourth Amendment.[5] He suggests that the officers lacked probable cause to seize the car in connection with the peeping Tom investigation, because that investigation had concluded by the time that the car was towed. (Pl.'s Mot. for Summ. J. at 13–15.) The problem with this argument is that the decision to seize the vehicle was largely unrelated to the criminal investigation that originally drew the officers to the parking lot. According to Lieutenant Groomes, the car was ticketed and towed because she believed it was illegally parked on private property, *not* because it was thought relevant to the peeping Tom complaint: "He could not offer any reason for legally being there. He did not have a sticker or anything in his window saying he belongs there. He was also parked in the middle of the lot in an unmarked space just blocking the lot by the dumpster. He was not in a legally marked space." (Groomes Dep. 43:5–10.) Thus, the fact that the officers may have no longer suspected plaintiff of peeping or engaging in any other criminal activity is beside the point. Their legal authority to tow his car was derived from a different source.

The question thus becomes whether this authority is sufficient to justify the seizure. It is a violation of D.C. law to park on private property without the permission of the property owner. *See* D.C. CODE § 50–261(a). If the officers had probable cause to believe that plaintiff lacked such permission, and was thereby parked illegally, there can be little doubt that they would have been entitled to issue a ticket. Moreover, if the car was "unoccupied," it appears that the city's municipal regulations would provide legal permission to tow the car as well. *See* 18 D.C. Mun. Regs. § 2421.1.[6] These facts, if established,

5. There is no question that plaintiff's car was seized within the meaning of the Fourth Amendment when it was towed from the Church Street lot. *See Soldal v. Cook County,* 506 U.S. 56, 61–62, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (holding that towing away a mobile home was a seizure as it amounted to a "meaningful interference with an individual's possessory interests in that property"); *United States v. Bagley,* 772 F.2d 482, 490 (9th Cir.1985) (acknowledging that "towing the automobile to the police lot constituted a seizure within the meaning of the fourth amendment").

6. This regulation provides as follows: "Any unattended vehicle found parked in violation of any traffic regulation, except overtime parking of less than twenty-four (24) hours, may, by or under the direction of a member or members of the Metropolitan Police force or employees of the Department of Public

would likely rule out a Fourth Amendment violation based on the officers' decision to tow the car.[7] *Cf. Johnson v. Goldsmith*, 1997 WL 174097, at *2 (7th Cir. Apr.7, 1997) ("So long as [defendant] had probable cause to believe that [plaintiff's] car was parked illegally, he was justified in ticketing Johnson's car and having it towed, and no liability under § 1983 attaches to his actions.").

On this record, however, the Court is unable to resolve the constitutionality of Lieutenant Groomes' actions. While it appears that plaintiff did not in fact have specific permission from the property owner to park in the Church Street lot (Defs.' Stat. ¶ 10), this does not establish that she had probable cause to so believe at the time she issued the ticket and carried out the impoundment. It is of course only contemporaneous information that is relevant in determining whether a seizure was constitutionally permissible. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (validity of an arrest under the Fourth Amendment turns on "whether, *the arrest at the moment was made*, the officers had probable cause to make it—whether, at that moment the facts and circumstances within their knowledge and of which they had reason-

ably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense") (emphasis added). And here, according to Lieutenant Groomes, she decided to ticket and tow plaintiff's car based on the fact that the vehicle had no sticker proclaiming plaintiff's permission to park in the Church Street lot combined with plaintiff's refusal to answer the officers' questions about what he was doing there. (Groomes Dep. 43:5–10.)

Even if these facts are sufficient to create probable cause to think that plaintiff was parked illegally, and therefore to justify the ticket, they do not necessarily support the separate decision to tow. As an initial matter, it is far from clear that the car was "unoccupied" within the meaning of the towing regulation when it was impounded. The car was certainly occupied when the officers first came onto the scene. According to plaintiff, he only left the car and the lot because the officers ordered him to do so: "they call me in the office and said, give us the car keys, so I gave him the car keys, then they said, now, get out of here, I said, this is a free country, I can stay, no, no, you better

Works, either by towing or otherwise, be removed or conveyed to any street where parking is not prohibited (except for more than eighteen (18) hours) or be removed or conveyed to and impounded in or at the police precinct station of the police precinct in which the vehicle may be found, or any other place designated by the Director."

7. Defendants suggest that because this seizure took place outside of the context of a criminal investigation, it should not be analyzed under the Fourth Amendment, but instead under Fifth Amendment principles of due process. (Defs.' Opp. at 4.) This argument is squarely refuted by the Supreme Court's decision in *Soldal*. There, the Court "reaffirm[ed]" that the Amendment's protections apply in the civil context as well as in the criminal, 506 U.S.

at 66–67 & n. 11, 113 S.Ct. 538, and held expressly that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place," *id.* at 68. *Soldal* makes clear that the Amendment protects "pure property interests" (*i.e.* those not necessarily connected to invasions of personal privacy) in both law-enforcement and non-law-enforcement settings. *Id.* at 68 n. 13, 113 S.Ct. 538. Thus, the towing of plaintiff's vehicle remains a seizure subject to the Fourth Amendment's command of reasonableness even though it was not carried out for purposes of criminal law-enforcement and even though it was neither the end product of, nor the prelude to, a search of that vehicle for contraband.

leave from out of here. I said, well, ok, there's five of them, there's only one of me, it's twelve thirty, one o'clock at night, don't argue, go away." (Pl.'s Mot. for Summ. J., Ex. 21 at 3.) For the police to tow a vehicle from private property—even an illegally parked one—only after they have chased away the car's lawful owner and confiscated his car keys, may well amount to the kind of unreasonable seizure proscribed by Fourth Amendment.

Moreover, there are factual disagreements between the parties regarding other significant events that led to the car's impoundment. The parties dispute, for example, whether plaintiff was warned that he might be towed and whether he refused the chance to drive away freely. For their part, defendants contend that they gave plaintiff ample opportunity to leave voluntarily with his car. They claim that they only decided to initiate the tow after plaintiff refused these offers and obstinately refused to answer their questions about what he was doing in the area.[8] If this version of events is true, it suggests a reasonable seizure. If, on the other hand, as plaintiff contends, he was told he could avoid towing only if he pleaded guilty to the peeping Tom allegation, and was not allowed to drive away freely even once the officers had decided that he had nothing to do with that allegation,[9] defendants' actions seem far less justifiable. Towing a car merely because its owner refuses to confess to a crime hardly seems the kind of seizure permitted by the Fourth Amendment.[10] As such, these factual disputes are clearly material, which precludes this issue from being resolved on summary judgment.[11]

8. According to Officer Kashinsky, plaintiff was told several times that he was parked on private property and would be towed if he did not leave. Indeed, he testified that Lieutenant Groomes even suggested to plaintiff that she had permission to tow his car away from the lot. Plaintiff did not respond, but ultimately removed some of his personal effects from the car and left. (Kashinsky Dep. 20:20–21:22).

9. In the statement that plaintiff gave to the Office of Citizen Complaint Review, he reported that Lieutenant Groomes said "why don't you plead guilty, you plead guilty and we'll let you go, and if you don't plead guilty, we'll throw your car away..." (Pl.'s Mot. for Summ. J., Ex. 21 at 3.) Moreover, in his deposition, he claimed that when he left the lot (having been ordered to do so by the officers), he did not know that they were planning on towing his car, although he acknowledged that Groomes had been talking about that possibility. (Qutb.Dep.95:15–21.)

10. Also troubling is the fact that an MPD Order prohibits officers from impounding vehicles found on private property unless "the property owner or manager so requests, and signs the back of copy A of the [Notice of Infraction] and the back of the tow crane receipt." MPD General Order 303–3(C)(2) (eff.Dec. 28, 1979). It is undisputed here that the officers did not comply with this directive; they did not seek or receive a request from the lot owner to tow plaintiff's car, and the owner certainly did not sign either the ticket or the towing receipt. (Pl.'s Stat. ¶ 34; Groomes Dep. 45:20–46:2.) Without intimating that the violation of this Order would itself render the seizure of plaintiff's car unreasonable within the meaning of the Fourth Amendment, the violation is one that further precludes summary resolution of this constitutional question. As discussed below, this violation is also central to plaintiff's claim that the towing of his car violated the Fifth Amendment.

11. The Court can, however, dispose of plaintiff's argument that defendants' alleged failure to provide him with sufficient information to retrieve his seized property rendered the seizure unreasonable. (Pl.'s Mot. for Summ. J. at 14.) This argument rests on a misreading of *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). There, the Supreme Court extended the "stop-and-frisk" doctrine of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to allow law enforcement officers to make brief, investigative seizures of personal property based only on reasonable suspicion. The Court rec-

## B. Fifth Amendment

■ Plaintiff also challenges the towing of his car under the Fifth Amendment, specifically the Due Process Clause.[12] He

ognized that such seizures are an exception to the Fourth Amendment's general rule, which requires probable cause before persons or property may be detained. *Place*, 462 U.S. at 700–02, 103 S.Ct. 2637. Because it was carving out an exception, the Court emphasized that the class of investigative seizures allowed based only on reasonable suspicion had to be limited in duration and intrusiveness; seizures that last longer or that impose a greater burden on the individual require probable cause. It was in this context that the Court held that the detention of Place's luggage for 90 minutes was unreasonable in the absence of probable cause. Moreover, the Court observed that this violation "was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion." *Id.* at 710, 103 S.Ct. 2637.

Thus, contrary to plaintiff's suggestion, *Place* does *not* stand for the proposition that it is unreasonable (and therefore unconstitutional) for the police to seize property for longer than 90 minutes, or to fail to provide information to the property owner about where his property has been taken or how to retrieve it. Rather, the case holds that the police generally cannot do these things based on the investigative detention rationale of *Terry* and its progeny, that is, without probable cause. Where the seizure is based on probable cause, however, the guideposts that *Place* sets forth are simply inapposite. *See Lee v. City of Chicago*, 330 F.3d 456, 464 (7th Cir.2003) (suggesting that *Place* "has no application after probable cause to seize has been established"). In the present case, as explained above, the challenged seizure was not based on *Terry*'s notion of reasonable suspicion of criminal activity, but instead on Lieutenant Groomes' conclusion (based on probable cause) that plaintiff's car was parked illegally and warranted being impounded. There is a genuine factual dispute as to whether the latter conclusion was reasonable, which precludes summary judgment on plaintiff's Fourth Amendment claim. Assuming, however, that it was reasonable, the possibility that the officers failed to tell plaintiff how to get his car back would not cast doubt on the constitutionality of the initial seizure.

**12.** As an initial matter, the Court rejects defendants' claim that plaintiff cannot challenge the initial towing of his vehicle under the Fifth Amendment, because that issue is "more properly analyzed under the Fourth Amendment." (Defs.' Mot. for Summ. J. at 13–14.) The first problem with this suggestion is that it flatly contradicts defendants' earlier argument that the challenge to the towing is only cognizable under the Due Process Clause. (*See supra*, note 7.) Defendants cannot have it both ways. Moreover, and more importantly, this argument misapplies the Supreme Court's admonition that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.' " *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The Fifth Amendment claim that plaintiff articulates here is not rooted in *substantive* due process, but rather is based solely on *procedural* due process. (Pl.'s Reply at 3–4.) As such, it is not subject to the channeling rule articulated in *Albright* and *Graham*. Indeed, the Supreme Court has expressly rebuffed the argument that "the Fourth Amendment is the beginning and end of the constitutional inquiry whenever a seizure occurs." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 49–52, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that seizures of real property for purposes of civil forfeiture are governed by both the Fourth and the Fifth Amendments).

Finally, defendants' suggestion that the Fifth Amendment has nothing to say about the initial seizure of plaintiff's car (and instead only comes into play insofar as the District continued to hold the vehicle without giving plaintiff a chance to get it back) is simply wrong. Claims that the government must afford certain safeguards *before* depriving individuals of their property are appropriately pursued as procedural due process claims. This is, in fact, one of the core purposes of the Due Process Clause. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)

does *not* assert that the District failed to provide adequate procedures to allow him to challenge the legality of the towing after the fact and to thereby regain possession of his vehicle once it had been impounded.[13] (Pl.'s Opp. at 12–13.) Instead, his argument is limited to the pre-deprivation context. He contends that defendants violated due process by towing his car without first providing sufficient procedural protections to prevent erroneous deprivations. Defendants argue that, so limited, plaintiff's claim fails on account of the D.C. Circuit's decision in *Cokinos v. District of Columbia*, 728 F.2d 502 (D.C.Cir.1983), which rejected the argument that due process required that the District provide car owners with notice and a hearing before towing vehicles from city streets. *See also Sutton v. City of Milwaukee*, 672 F.2d 644, 646 (7th Cir.1982) (holding that "it is not a violation of the due process clause to tow an illegally parked car without first giving the owner notice and an opportunity to be heard with respect to the lawfulness of the tow"). *But cf. Graff v. Nicholl*, 370 F.Supp. 974 (N.D.Ill.1974) (holding that the towing of abandoned vehicles without notice and opportunity for a hearing violated due process).

Plaintiff's claim is materially different, however, in that the pre-towing procedural protection he seeks is not notice and a hearing, but instead compliance with ·the police department's own rule that before towing cars from private property, officers must secure the express consent of the property owner. (Pl.'s Opp. at 13.) Given

that due process "is a flexible concept that varies with the particular situation," *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), this assertion cannot be dismissed simply by reference to the existing case law. In fact, the protections requested here are significantly more limited in scope than those at issue in *Cokinos* and *Sutton*, since plaintiff's claim extends only to situations where cars are parked on private property and do not require the police to locate the car's owner before initiating the tow. No hearing, indeed no adjudicatory mechanism of any sort, is contemplated by plaintiff's request.

The legal framework for evaluating this sort of due process argument is well-established. It begins with the general rule that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127, 110 S.Ct. 975; *see also Leary v. Daeschner*, 228 F.3d 729, 742 (6th Cir.2000) ("When a plaintiff has a protected property interest, a predeprivation hearing of some sort is generally required to satisfy the dictates of due process."). Indeed, the Supreme Court has said that "absent 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,'" post-deprivation hearings are "constitutionally inadequate." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). Of course, this

("We have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.") (internal quotation marks omitted). Thus, because the Supreme Court has "rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another," in this case "the

proper question is not which Amendment controls but whether either Amendment *is* violated." *James Daniel Good Real Property*, 510 U.S. at 49–50, 114 S.Ct. 492.

13. Claims of that sort have been adjudicated in *Gable v. City of Chicago*, 296 F.3d 531 (7th Cir.2002), and *Holstein v. City of Chicago*, 29 F.3d 1145, 1149 (7th Cir.1994).

preference for pre-deprivation procedures is not absolute, *see FDIC v. Mallen,* 486 U.S. 230, 240–41, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), and thus in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court offered a "simple cost-benefit test of general applicability" for determining whether the government is required to use a particular set of procedures before depriving a person of property.[14] *Sutton,* 672 F.2d at 645.

This is the test that must be applied here. *See Tri County Indus., Inc. v. District of Columbia,* 104 F.3d 455, 460 (D.C.Cir.1997) ("Evaluation of the adequacy of pre-deprivation procedures is governed by the balancing test stated in *Mathews v. Eldridge.*"). *Mathews* instructs courts to balance three factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. 893; *see also City of Los Angeles v. David,* — U.S. —, 123 S.Ct. 1895, 155 L.Ed.2d 946 (2003); *Sutton,* 672 F.2d at 645 (explaining that the test requires "comparing the benefit of the procedural safeguard sought, which is

a function of the value of the property interest at stake and the probability of erroneous deprivations if the safeguard is not provided, with the cost of the safeguard.").

Even were the Court to agree with the Seventh Circuit's conclusion that the property interest at stake in the towing context (the loss of the car for a relatively brief spell between the impoundment and the post-deprivation hearing) "is a slight one," *Sutton,* 672 F.2d at 646, the values to assign to the other two factors are difficult, if not impossible, to determine on the record in this case. And, given the more modest nature of plaintiff's due process claim, *Sutton* is of little help in this regard. For it may be that the police are more likely to make mistakes in determining that cars are wrongfully parked on private property, where the legal issue generally turns on the property owner's consent rather than an objective determination such as is the case, for example, when a meter has expired or a car is found in a no-parking zone. Whether such consent has been granted can often not be determined merely by looking at the parked car itself. As such, consulting the property owner could well prevent a number of improper towings. Moreover, it can be inferred from the fact that an MPD General Order already requires such consultations (*see supra,* note 10) that the government interest in being able to tow cars without the consent of the property owner is not overpowering.[15] Finally, because

---

**14.** Even before *Mathews,* the Supreme Court had made clear that "in limited circumstances, immediate seizure of a property interest, without an opportunity for prior hearing, is constitutionally permissible." *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 678, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Such circumstances are those in which "the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has

been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Fuentes v. Shevin,* 407 U.S. 67, 91, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

**15.** This is not to suggest that due process was violated merely because the District failed to

under the approach advocated by plaintiff, the police would need to notify the property owner instead of the vehicle owner, the concern aired in *Sutton* that advance notice could lead to the removal of the property from the reach of the authorities, *id.* at 647, does not appear to be present here.

These observations, however, are largely speculative at this point, as defendants have not specifically addressed the *Mathews* factors in their pleadings. In the absence of guidance from the parties, and given the possibility that certain disputed facts may bear on this constitutional issue,[16] the Court does not believe that the granting of summary judgment on the due process claim is appropriate. Given the parties inattention to the dictates of *Mathews* and the nuances of *Sutton,* the Court is not presently in a position to consider whether the value of the safeguard plaintiff seeks so outweighs the costs it may impose on the District that it must be enshrined as a constitutional right. In particular, defendants have done nothing to show that it would be so expensive or administratively cumbersome to follow the very MPD General Order that already governs the police—or that immediate towing from private property serves such important governmental interests—that the deprivations that may be imposed on car owners as a result of officers not heeding that Order are justified. Without more, the context-specific balancing called for by *Mathews* and *Sutton* cannot be performed accurately and plaintiff's due

process claim cannot be resolved at this time.

## C. Municipal Liability

■ The final issue connected with plaintiff's challenge to the towing of his car is whether the District can be held liable for the constitutional violations allegedly committed by members of its police force. The legal contours of municipal liability are well-established. Under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a city can be held liable under § 1983, not under principles of *respondeat superior,* but instead only where its own "policy or custom ... inflicts the injury." *Id.* at 694, 98 S.Ct. 2018. The failure to train or supervise city employees can amount to such a policy or custom "when it can be said that the failure amounts to 'deliberate indifference towards the constitutional rights of persons in its domain.'" *Daskalea v. District of Columbia,* 227 F.3d 433, 441 (D.C.Cir.2000) (quoting *City of Canton v. Harris,* 489 U.S. 378, 388–89 & n. 7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Atchinson v. District of Columbia,* 73 F.3d 418, 421 (D.C.Cir.1996) (failure to train can give rise to municipal liability if that failure represents city policy and reflects deliberate indifference). However, because individual officers lack "final policymaking authority," their mere exercise of discretion, not in service of any municipally-established policy, is insufficient to render the city liable. *See Triplett v. Dis-*

---

abide by its own procedural rules. *See Brandon v. District of Columbia,* 823 F.2d 644, 649 (D.C.Cir.1987) ("[A] state does not violate an individual's federal constitutional right to procedural due process merely by deviating from its own established procedures.").

**16.** For example, if plaintiff were parked so as to have been blocking traffic into and out of the lot, it may have been appropriate to tow his car even without the specific permission

of the lot owner. (Groomes Dep. 43:9–10.) Moreover, if Groomes asked plaintiff whether he had permission to park at the Church Street Lot, and plaintiff refused to answer, it is possible that due process would not have required the officers to go through the additional step of contacting the property owner to confirm that plaintiff had no right to be there.

*trict of Columbia*, 108 F.3d 1450, 1453 (D.C.Cir.1997) (quoting *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

In this case, plaintiff's municipal liability claim relates to the officers' decision to tow his car without first securing the permission of the lot owner or manager.[17] And because the MPD has adopted a written rule expressly forbidding that practice, plaintiff can only prevail by showing that the Department's top policymakers were "deliberately indifferent to the policy's violation." *Daskalea*, 227 F.3d at 442. Such indifference may be evidenced by the city's persistent failure to train or supervise officers with respect to that policy despite knowing that it was systematically being disregarded in an unconstitutional manner. *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 407–08, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (a "pattern of tortious conduct" by inadequately trained or supervised employees may show deliberate indifference); *Canton*, 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor J., concurring) (municipal liability may be appropriate "where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion"). But plaintiff must show more than simple or even heightened negligence in order to prevail; the indifference must be conscious, or at least reckless. *See Brown*, 520 U.S. at 407–08, 117 S.Ct. 1382; *Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

Plaintiff has failed to make that showing. In an attempt to do so, he relies heavily on a Report issued by the District's Office of the Inspector General two months *after* the incident that is the basis for his claims. *See* Report of Investigation Concerning a Review of the District of Columbia Towing Regulations And its Enforcement, OIG No. 99–0318(s) (March 30, 2001). (Pl.'s Mot. for Summ. J., Ex. 20.) The Report related several instances in which cars were apparently towed from private property with proper authorization, *id.* at 2–3, and concluded that "[p]rocedures, set forth in MPD General Order 303.3, are not always followed by MPD officers." *Id.* at 9. It also recommended that officers be held accountable for failure to abide by the General Order, although it made no specific finding that MPD had willfully failed to discipline officers for such infractions in the past. *Id.*

Even assuming that this Report is competent evidence and does describe a "pattern of tortious conduct,"[18] it would only

---

17. It should be noted that this claim can plausibly relate only to plaintiff's Fifth Amendment argument. As described above, the potential Fourth Amendment violation that remains in this case is only marginally linked to the fact that plaintiff's car was towed from private property without the consent of the property owner. Instead, that violation is based on the way in which the officers may have forced plaintiff to leave the lot without giving him a chance to avoid being towed. And there is no evidence whatsoever to suggest that these actions were attributable to anyone other than the individuals on the scene on the morning of February 4, 2003. Plaintiff has made no attempt to link that conduct to any policy or custom of the District of Columbia.

18. The validity of these assumptions is far from obvious. Indeed, two of the three incidents described in the Report are labeled merely as "allegations" based on complaints received from private citizens. There is no indication that the authors of the Report independently investigated these complaints in an effort to verify their accuracy. (OIG Report, at 2–3. (Pl.'s Mot. for Summ. J., Ex. 20.).) Nor does the Report attempt to estimate how widespread the towing abuses were or how frequently cars were towed from private property without the property owner's permission. This is not to impugn the quality of the Report, but to suggest that it does not provide much of a foundation for establishing a genuine pattern of abuse, as distinguished from individual instances of rouge behavior. *Cf.*

suggest deliberate indifference if there was some indication that District was aware, or should have been aware, of that pattern at the time that plaintiff's rights were allegedly violated. And the Report was published too late to establish such awareness. If the Report had come out before plaintiff's car was towed, it arguably could have provided notice to the District that there were problems with private property towing. If the city had then done nothing in response, that failure to supervise or to discipline could possibly then have constituted a policy that a jury could have concluded was responsible for the harm suffered by plaintiff. But the findings of the Report were known only after the incident at issue here occurred. As such, the Report cannot be used to suggest that the District took no action to curb a problem about which it had been put on notice, or that such inaction was the "moving force" behind plaintiff's injuries. *Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

Nor does it change matters that some of the conduct described in the Report occurred before plaintiff's car was towed. What matters is not what individual officers may have been doing, but instead what the District itself knew or should have known about such conduct. *See Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir.1987) ("[F]ault for a violation resulting from a condoned custom can only be ascribed when a pattern of comparable practices has become actually or constructively known to responsible policymakers."). And nothing in the Report suggests that those in charge of police policy were aware of the abuses described at the time they were happening. Indeed, the very purpose of the Report was to bring these problems to light.

Nor has plaintiff amassed any other evidence to suggest that in, February 2001, the District had actual or constructive knowledge of a pattern of unauthorized towing from private property.[19] *Cf. Cox v. District of Columbia*, 821 F.Supp. 1, 18 (D.D.C.1993) ("Constructive knowledge 'may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these.' ") (quoting *Spell*, 824 F.2d at 1391). He has not established that any specific warnings were issued to those high up in the District hierarchy, or that the abuses were so "open and notorious" as to make it reasonable to think that the city's failure to take action must have been a product of deliberate indifference. *Daskalea*, 227 F.3d at

---

*Carter v. District of Columbia*, 795 F.2d 116, 125–26 (D.C.Cir.1986) (rejecting municipal liability claim "for want of proof of a persistent, pervasive practice, attributable to a course deliberately pursued by official policymakers, one that caused the deprivation of constitutional rights plaintiffs experienced").

As to admissibility, while the Report clearly contains hearsay, plaintiff argues that it is admissible under FED. R. EVID. 803(8), which exempts from the hearsay rule reports of public offices or agencies. Specifically, Rule 803(8)(C) allows as evidence "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate a lack of trustworthiness." Insofar

as the Report repeats mere allegations, such sources of information might well reflect a lack of trustworthiness that would make it difficult to admit those sections of the Report in order to prove that there was a widespread practice of towing cars without the consent of the property owner.

**19.** *The Washington Post* article cited by plaintiff (Pl.'s Mot. for Summ. J. at 20, Ex. 25) is plainly hearsay and is not admissible under any of the exceptions to the hearsay rule. The Court will therefore not consider it in evaluating the motions for summary judgment. *See Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C.Cir.2000).

442; *see also Triplett,* 108 F.3d at 1453 (finding no municipal liability where plaintiff adduced no evidence that the District's top policymakers "knew of or disregarded a practice of excessive force by D.C. correctional officers"). Plaintiff has not even suggested a mechanism by which top city officials should have become aware of the problem before the OIG issued its report. Indeed, plaintiff concedes that "MPD officers receive training about proper towing procedures" (Plaintiff's Stat. ¶ 28), and he has presented no evidence that this training "was accompanied by winks and nods to the contrary. . . ." *Triplett,* 108 F.3d at 1453. As such, even when the evidence is construed favorably on behalf of plaintiff, the failure of the individual officers here to abide by MPD General Order 303 suggests the exercise of discretion on their part, rather than a pattern and practice of municipal indifference. Under these circumstances, to impose liability on the District for the action of its officers would be to impose the kind of vicarious liability not available under § 1983. The Court will therefore grant summary judgment to the District as to plaintiff's constitutional claims.

### III. *The Remaining Claims in Defendants' Motion for Summary Judgment*

#### A. Excessive Force

█ Defendants argue that the record cannot support the claim that the police used excessive force against plaintiff in violation of the Fourth Amendment. In support of this allegation, plaintiff has pointed to two instances in which he was touched by Officer Wilson on the morning of February 4, 2001. The only evidence regarding these incidents comes from plaintiff's deposition.[20] The first occurred as plaintiff was speaking with Officer Groomes: "It was while I was talking to Groomes and he [Wilson] was standing right next to me. I was arguing with her and he reached out for no reason at all and rubbed the palm of his hand against the front of my belly like this." (Qutb Dep. at 84:21–85:3.) In the deposition, plaintiff was asked whether the force of this touch caused him "to stumble or move backwards or anything like that." He answered no, but added that "it was enough to create nausea, to create wanting to desire to puke all over them. I don't appreciate being touched by men." (*Id.* at 84:9–14.) The second incident took place a short time later, as plaintiff was leaving the parking lot. "That was after they had taken my keys and they told me to leave the parking lot and I said I didn't have to and they insisted I do. As I was walking away he [Wilson] pushed me with the back of his hand." (*Id.* at 87:4–8.) Plaintiff elaborated that the officer had touched him with the back of one hand between the shoulder blades. (*Id.* at 88:3–10.) Plaintiff does not suggest that he was physically injured as a result of these incidents, but does claim that they caused him mental and emotional distress, including symptoms of Post Traumatic Stress Disorder. (Pl.'s Opp. to Defs.' Mot. for Summ. J. at 9–10.)

In response, defendants contend that summary judgment is appropriate because the facts set forth above do not rise to the level of a constitutional violation and, even if they did, Officer Wilson would be entitled to qualified immunity. In *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court established a two-part process for the

20. The officers deny that any of them made physical contact with plaintiff. (Pl.'s Opp. at 6.)

analysis of qualified immunity claims under § 1983. First, the court must ask whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. If not, qualified immunity is appropriate and no further discussion is required. If plaintiff's rights were violated, however, the court must go on to determine whether, "in light of the specific context of the case," the trammeled right was "clearly established." *Id.* at 201, 121 S.Ct. 2151.

In the context of excessive force claims, the initial constitutional inquiry is governed by the objectively reasonable standard set forth in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). There, the Supreme Court held that the question of whether the use of force violates the Fourth Amendment turns not on the defendants' subjective intent or motive, but rather on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, ..." *Id.* at 397, 109 S.Ct. 1865. This must be evaluated from the perspective of the officer on the scene at the time that the force was employed. A number of factors may be relevant to this objective determination, including the severity of the crime at issue, the threat posed by the suspect, and whether the suspect is attempting to evade arrest. *Id.* at 396, 109 S.Ct. 1865.

However, while applying *Graham* must be the first step in the analysis, *Saucier* makes clear that qualified immunity confers upon officers an extra layer of protection from § 1983 liability. For, even if the degree of force used might, objectively speaking, exceed that allowed by the Fourth Amendment, immunity should be granted where the officer was reasonably mistaken (in light of the then-existing state of the law) about "whether a particular amount of force [was] legal" under the circumstances. *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. Because it is not always clear where acceptable force crosses the line into excessive force, an officer who reasonably perceives that he is acting within the limits set by the Constitution may not be held liable if he turns out to be wrong. Therefore, unless the law "put[s] the officer on notice that his conduct would be clearly be unlawful," summary judgment based on qualified immunity is appropriate. *Id.*[21]

---

**21.** While this notice can come in various forms, it derives most frequently from binding case law. In the context of excessive force claims, the focus will be on cases decided prior to the incident complained of holding that a particular level of force is unconstitutional under a particular set of factual circumstances. Where the case at hand presents facts "not distinguishable in a fair way" from those under which a violation has previously been found, qualified immunity is not proper. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151; *see also Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir.2000) (observing that "unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity"). At the same time, however, some police brutality is so far beyond the pale that it is obviously excessive even in the absence of specific, factually indistinguishable case law that says so. The Supreme Court has recognized that in some situations, "a general constitutional rule already identified in the decisional law [e.g., that the objectively unreasonable use of force violates the Fourth Amendment] may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432

In the present case, the facts set forth by plaintiff do not rise to the level of unconstitutionally excessive force. It is clear that " '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 [citation omitted]. And, while neither the D.C. Circuit nor the Supreme Court has expressly embraced a de minimis force rule in the context of Fourth Amendment excessive force claims, other courts have.[22] *See Nolin v. Isbell*, 207 F.3d 1253, 1255–58 (11th Cir. 2000) ( [T]his Circuit has established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."); *Ikerd v. Blair*, 101 F.3d 430, 434 & n. 9 (5th Cir.1996) ("[A] constitutional violation does not occur every time an officer touches someone. In just about every conceivable situation, some amount of force or contact would be too nominal to constitute a constitutional violation."); *see also Vinyard*, 311 F.3d at 1348 n. 13 (citing cases and holding that

the force used and injury sustained when an officer jerked an arrestee out of her chair by the arm was de minimis). Such a rule recognizes that certain kinds of physical contact between police and civilians, even if not strictly necessary when judged from the perspective of hindsight, is simply an acceptable part of life and ultimately too insignificant to merit constitutional condemnation.

If ever there were an example of such contact, it would be the present case. Even assuming that the first contact (the rub) was purposeful rather than accidental, the record is clear that it was not intended to hurt, subdue, restrain, or otherwise inflict harm on plaintiff. This contact, even by plaintiff's own account, appears to have been little more than a brush. The second event (the push) seems hardly more serious. Officer Wilson may have made physical contact with plaintiff, but not in any forceful or potentially harmful way. Indeed, plaintiff acknowledged in his deposition that the level of pressure applied was not sufficient to have left a mark.[23] (Qutb

(1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *see also Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (observing that "officials can still be on notice that their conduct violates established law even in novel factual circumstances" and that qualified immunity can be withheld even in the absence of prior cases with "materially similar facts"). Thus, for example, the Eleventh Circuit has held that the use of pepper spray on a handcuffed arrestee in the back seat of a police car was "so far beyond the hazy border between excessive and unreasonable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point." *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir.2002) (quoting *Priester*, 208 F.3d at 926); *see also id.* at 1350 n. 18 (citing similar cases).

**22.** In *Hudson v. McMillian*, the Supreme Court recognized a de minimis principle in the context of excessive force claims brought

by prisoners pursuant to the Eighth Amendment's Cruel and Unusual Punishment Clause. That prohibition, the Court suggested, "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

**23.** Although there is generally no requirement that an individual must suffer a serious physical injury in order to maintain a § 1983 action for excessive force in violation of the Fourth Amendment, *see, e.g., Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir.1999); *Burbank v. Davis*, 238 F.Supp.2d 317, 320 (D.Me.2003); *cf. Lambert v. City of Dumas*, 187 F.3d 931, 936 & n. 7 (8th Cir.1999) (holding that there is no "significant injury" requirement, but assuming without deciding that an excessive force plaintiff must show

Dep. at 91:15–19.) It is difficult to conceive of any situation in which this minimal degree of force would support an excessive force claim. The claim underlying plaintiff's argument—that "whenever a law enforcement officer *touches* a person who is not under arrest the amount of force is thereby per se 'excessive' "—lacks both legal support and practical justification. *Martin v. Mendoza*, 230 F.Supp.2d 665, 671–72 (D.Md.2002) (holding that even if a police officer grabbed plaintiff's arm in a way that caused muscle soreness but no actual physical injury, this was not sufficient to support a Fourth Amendment excessive force claim). The degree of force used by Officer Wilson was but a trifle; as such, it was not objectively unreasonable and falls well below the threshold necessary to establish a violation of the Fourth Amendment.

■ Even if the Court is mistaken, however, and the amount of force used against plaintiff was somehow impermissible, Officer Wilson would still be entitled to qualified immunity. As explained above, immunity applies unless clearly established legal standards would have made it obvious to any reasonable officer that the level of force used was unlawful. This was not the case here. Plaintiff points to no authority holding that a police officer's mere touch of a person during a *Terry* stop, where virtually no force was applied, runs afoul of the Constitution. (Pl.'s Opp. at 10–11.) Indeed, plaintiff points to no case law at all, other than *Graham*, which established only the general principle that excessive force can violate the Fourth Amendment, a principle that *Saucier* explicitly held "is

not enough" to put officers on notice for qualified immunity purposes. *Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151. And the Court's own research has not revealed any cases in which a constitutional violation was found under circumstances even remotely analogous facts to those here.

As such, the only remaining question is whether Officer Wilson's conduct so obviously amounted to excessive force that no reasonable officer could have thought his actions were within the bounds set by the Fourth Amendment. *See, e.g., Priester*, 208 F.3d at 927 (holding that no reasonable officer could have thought it permissible to release a dog to bite a prone suspect who was not attempting to flee or resist arrest, and therefore that immunity was not proper even in the absence of "particularized preexisting case law"). The brutality that falls into this category represents the most egregious and gratuitously cruel abuse of police power. Whatever else can be said about Officer Wilson's rubbing and pushing of plaintiff, those actions simply do not rise to this level. They are not the kind of barbarism that lie at the "very core of what the Fourth Amendment prohibits," *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir.2002), and whose very nature conveys fair warning that they have been proscribed.

Indeed, it is simply not the case that every instance of unnecessary physical contact between a police officer and a citizen is automatically unconstitutional. In *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir.1993), for example, the Eleventh Circuit considered whether quali-

---

"actual injury"), the magnitude of the injury (if any) is certainly relevant in evaluating the degree of force used, and is in this sense relevant to the constitutional analysis. *See Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n. 7 (D.C.Cir.1993) ("[W]e do not suggest that an individual must suffer significant injuries in

order for the force used to be unreasonable. Although the severity of [plaintiff's] injuries is not by itself the basis for deciding whether the force used was excessive, it does provide some indication of the degree of force [defendant] used.").

fied immunity was appropriate for an officer who pushed a handcuffed arrestee against a wall. The court acknowledged that under those circumstances "no further force was needed," but nevertheless granted immunity. "That the amount of force [defendant] used, even if unnecessary, was enough to violate the law was not plain; reasonable doubt existed, and still exists, on whether this amount of *unnecessary* force was unlawful." *Id.* at 1559–60 (emphasis added). So it is here as well. Even if Officer Wilson was mistaken in his belief that it was lawful to touch plaintiff as he did, that error was entirely understandable in the absence of any clearly established legal standards to tell him otherwise. And, because any mistake was reasonable, qualified immunity bars plaintiff's excessive force claim, and summary judgment on that claim must be granted in defendants' favor.

### B. Assault and Battery

 Repeating the allegations that underlie his excessive force claims, plaintiff asserts that Officer Wilson committed the common law offense of assault and battery. Under D.C. law, an assault is defined as "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim," and a battery is "an intentional act that causes a harmful or offensive bodily contact." *Etheredge v. District of Columbia,* 635 A.2d 908, 916 (D.C.1993). While the touchings described above meet this definition of battery, D.C. law grants police officers a "qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor believes to be reasonably necessary.'" *Id.* (quoting *Jackson v. District of Columbia,* 412 A.2d 948, 956 (D.C.1980)). The problem that defendants face in trying to rely on this privilege is that the officers here were not carrying out an arrest, nor were

they seeking to restrain or subdue plaintiff, at the time that the alleged battery took place. According to plaintiff's version of events, the physical contact was entirely gratuitous, and unrelated to any legitimate police objective. In these circumstances, it is not clear that the qualified privilege articulated by the D.C. Court of Appeals would even apply here. Nor have defendants identified any authority to suggest that a de minimis rule of the sort discussed in the context of the Fourth Amendment excessive force claim is available in an assault and battery case brought under D.C. law. For these reasons, the Court is unable to conclude that plaintiff's claim fails as a matter of law, and summary judgment is therefore inappropriate.

### C. Intentional Infliction of Emotional Distress

██ Under D.C. law, recovery for intentional infliction of emotional distress is limited to situations in which the defendant's conduct is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Kerrigan v. Britches of Georgetowne,* 705 A.2d 624, 628 (D.C.1997) (citation omitted). A plaintiff making this claim must establish a prima facie case that the conduct was (1) sufficiently extreme or outrageous as to (2) intentionally or recklessly cause (3) severe emotional distress to another. *Joyner v. Sibley Mem. Hosp.,* 826 A.2d 362, 373 (D.C.2003). Plaintiff has put forward evidence of the severe emotional anguish that he suffered in the wake of his encounter with the police. (Pl.'s Opp. at 23.) Believing that reasonable minds may differ as to the other two elements, the Court will leave to the jury the questions of whether the severity of defendants' actions (if plaintiff's version of events is ultimately

believed) crossed over into the truly outrageous and whether those actions were carried out with the requisite mental state to warrant liability.

### D. Punitive Damages

 Plaintiff seeks punitive damages only against the individual officers, not against the District of Columbia. (Pl.'s Opp. at 23.) Punitive damages against an individual defendant are available in a § 1983 action when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). The availability of punitive damages is an issue that cannot be resolved here on summary judgment. *See Sahagian v. Dickey*, 827 F.2d 90, 100 & n. 8 (7th Cir.1987). Were plaintiff's account to be credited, it would not necessarily be unreasonable for a jury to conclude that the officers' decision to tow the car was recklessly indifferent to plaintiff's Fourth Amendment right to be free from unreasonable seizures. The Court therefore cannot rule out punitive damages as a matter of law on this record.

### CONCLUSION

For the reasons given above, the Court will grant summary judgment to defendants on plaintiff's claims that the police engaged in excessive force in violation of the Fourth Amendment, carried out an unreasonable search of the vehicle in violation of that Amendment, and engaged in unjust enrichment. The Court will also grant summary judgment to the District as to plaintiff's claims under § 1983. The parties' motions are in all other respects denied.

### *ORDER*

For the reasons given in the attached Memorandum Opinion, it is hereby

**ORDERED** that plaintiff's Motion for Partial Summary Judgment is **DENIED**; it is

**FURTHER ORDERED** that defendant's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; it is

**FURTHER ORDERED** that Count 4 of plaintiff's Second Amended complaint (Unjust Enrichment) is **DISMISSED**; it is

**FURTHER ORDERED** that plaintiff's claim under 42 U.S.C. § 1983 based on excessive force in violation of the Fourth Amendment is **DISMISSED**; it is

**FURTHER ORDERED** that plaintiff's claim under 42 U.S.C. § 1983 based on a search of his vehicle in violation of the Fourth Amendment is **DISMISSED**; it is

**FURTHER ORDERED** that plaintiff's claims under 42 U.S.C. § 1983 against the District of Columbia are **DISMISSED**; and it is

**FURTHER ORDERED** this matter is set for a status on October 29, 2003 at 9:45 a.m.

**IT IS SO ORDERED.**